**FILED**
United States Court of Appeals
Tenth Circuit

**March 2, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

     Plaintiff-Appellee,

v.

DENNIS EMERSON GONZALEZ,

     Defendant-Appellant.

No. 09-6069

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. No. 5:CR-04-00179-R-1/5:CV-08-01182-R)**

---

William P. Earley, Assistant Federal Public Defender, Oklahoma City, Oklahoma, for Defendant-Appellant.

Leslie M. Maye, Assistant United States Attorney (Robert J. Troester, Acting United States Attorney, with her on the brief), Oklahoma City, Oklahoma, for Plaintiff-Appellee.

---

Before **BRISCOE, SEYMOUR,** and **LUCERO**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

---

     Defendant Dennis Gonzalez, currently serving a thirty-year sentence in connection with multiple drug-trafficking convictions arising out of his role in an Oklahoma City-based methamphetamine distribution operation, appeals from the

district court's denial of his 28 U.S.C. § 2255 motion to vacate, set aside, or correct sentence. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm the judgment of the district court and deny Gonzalez's request for a certificate of appealability on additional issues.

I

*Factual and procedural history*

The underlying factual and procedural history of Gonzalez's case was outlined by this court on direct appeal:

> After his arrest in the summer of 2003, Jason "Joker" Lujan cooperated with an Oklahoma City Police Department narcotics investigation. Mr. Lujan told the police that, beginning in early 2002, several members of a Hispanic gang from California, later identified as the Compton Varrio Tortilla Flats, moved to Oklahoma City to set up a methamphetamine-dealing operation. Mr. Lujan explained to the police that the members of the group included "Boxer," one of his confederates later identified as Mr. Gonzalez, who ran the operation from Florida; "Lalo," later identified as Eduardo Verduzco, who delivered the drugs to Oklahoma City at Mr. Gonzalez's direction; and Jennifer Lujan, his sister-in-law, who distributed the methamphetamine in Oklahoma City with the assistance of Mr. Gonzalez's girlfriend "Mousey," later identified as Maria Ginez. With Mr. Lujan's assistance, the police eventually seized over 2,800 grams of methamphetamine from participants in the drug ring and obtained indictments against twelve participants, including Mr. Gonzalez. Most of the defendants pled guilty and cooperated with the government. Along with two associates, Mr. Gonzalez–accused of being the group's ringleader–pled not guilty and proceeded to trial.
>
> In his opening statement before the jury, counsel for Mr. Gonzalez, Charles Kilgore, denied Mr. Gonzalez's involvement in "any kind of drug conspiracy." Tr. of Opening Stmt. at 27. The government, however, proceeded to present substantial evidence of

2

Mr. Gonzalez's guilt from more than a dozen cooperating witnesses, as well as 16 law enforcement officers, agents, and employees. The evidence at trial adduced that Mr. Gonzalez left Oklahoma for Florida in February 2003, after one of the members of the drug organization was arrested. According to testimony presented, Mr. Gonzalez continued to direct from Florida the California-to-Oklahoma drug operation, and, after his move, proceeds of various drug transactions were wired to Florida.

Responding to the proof presented by the government, Mr. Kilgore took a different tack in closing, admitting Mr. Gonzalez's involvement in the drug conspiracy but seeking to diminish it by suggesting that he participated only until February 2003, when he moved to Florida, and that Mr. Verduzco was the true ringleader. Thus, for example, Mr. Kilgore told the jury that "I'm not going to ask you to find [Mr. Gonzalez] not guilty on all of those counts, because if I did, I think you'd probably tune me out from the very beginning and just go somewhere else." Tr. of Closing Arg. (vol. 4) at 30-31. Likewise, Mr. Kilgore stated that Mr. Gonzalez's "involvement stopped in February of 2003," id. at 34, and that Mr. Gonzales [sic] was "a lieutenant . . . working for Lalo," id. at 35. And when discussing the particular counts charged, Mr. Kilgore submitted, for example, that "now, Count 1 is the conspiracy . . . . We'll submit . . . . Dennis [Gonzalez] was involved . . . . He wasn't the head, but he was involved. But I will argue that he was only involved . . . until he took off to Florida." Id. at 67.

After Mr. Kilgore's closing argument, the district court asked Mr. Kilgore if it should issue a conspiracy-withdrawal instruction to the jury. Id. at 75; see Docket Entry No. 382 (instruction titled "AFFIRMATIVE DEFENSE OF WITHDRAWAL FROM A CONSPIRACY"). The government agreed with the district court that such an instruction was appropriate. After reviewing the proposed instruction overnight, however, Mr. Kilgore declined the instruction, and the government did not request it. Tr. of Closing Arg. (vol. 4) at 106. The district court then generally instructed the jury, including an instruction indicating the vicarious liability of co-conspirators for the actions of others in the drug ring. See Docket Entry No. 382 (instruction titled "VICARIOUS LIABILITY OF CO-CONSPIRATORS"). Though there is no mention of it in the record before us, the parties' briefs represent that the district court

3

also sought and held additional meetings in chambers to discuss questions submitted by the jury. Apparently, either during or shortly after one of these conferences, the district court made some type of inquiry to Mr. Kilgore regarding whether his client had agreed to his change in tactics and concession of guilt. No transcript of the meeting seems to exist but the government represents that Mr. Kilgore said he altered his trial tactics with Mr. Gonzalez's permission. Mr. Gonzalez stresses that there is no indication in the record to confirm the accuracy of this representation and denies that he was ever informed of the pertinent chambers meeting or that he waived his right to be present during this proceeding.

Ultimately, [on July 25, 2005,] the jury found Mr. Gonzalez guilty of 63 of the 65 counts with which he was charged and, by means of a special verdict form, indicated that Mr. Gonzalez's conspiracy involved more than 500 grams of methamphetamine. See Docket Entry No. 385.

At sentencing [on November 21, 2005], the district court began its analysis with the advisory Guidelines' suggested sentencing range of ten years to life in prison and then proceeded to review the various factors set forth in 18 U.S.C. § 3553(a); the ultimate upshot: Mr. Gonzalez was sentenced to 30 years on each of 12 separate counts; 5 years each on 2 separate counts; 20 years each on 48 separate counts; and 30 years on a single remaining count at issue in this appeal. The district court indicated that its sentences would run concurrently, for a total of 30 years' imprisonment.

United States v. Gonzalez, 238 F. App'x 350, 351-53 (10th Cir. 2007) (footnotes omitted).

*Gonzalez's direct appeal*

Gonzalez filed a direct appeal asserting two claims of ineffective assistance of counsel, as well as a separate claim that his sentence on Count 29, for conspiracy to commit money laundering, was in violation of law. This court, in an unpublished order and judgment issued on June 25, 2007, deferred the

4

ineffective assistance claims to collateral proceedings, found merit to Gonzalez's sentencing challenge, and remanded for resentencing. On August 6, 2007, the district court, in accordance with this court's mandate, issued an order amending the judgment to reflect a sentence of twenty years' imprisonment on Count 29, to run concurrently with the sentences imposed on the other counts of conviction.

*Gonzalez's § 2255 motion*

On August 31, 2007, Gonzalez filed a pro se motion asking that counsel be appointed "to represent him in connection with the filing of a motion pursuant to 28 U.S.C. § 2255." ROA, Vol. 1 at 336. The district court granted Gonzalez's motion on September 11, 2007.

On November 4, 2008, Gonzalez, through appointed counsel, filed a § 2255 motion to vacate, set aside, or correct sentence. Gonzalez's motion asserted five grounds for relief: (1) that his trial counsel was ineffective for failing to investigate and call two witnesses, Marlene Gonzalez and Eduardo Verduzco, to support the theory of defense at trial, i.e., that Gonzalez withdrew from the charged conspiracy in February 2003 when he moved to Florida; (2) that his trial counsel was ineffective for failing to accept the trial court's proposed jury instruction on the defense of withdrawal from the conspiracy; (3) that his trial counsel's closing argument concession that Gonzalez was guilty of conspiracy caused a breakdown in the adversarial process and violated Gonzalez's constitutional rights; (4) that Gonzalez's absence from an in-chambers conference

5

during which counsel and the trial court discussed whether Gonzalez consented to his trial counsel's concession of partial guilt to the conspiracy charge violated his right to be present under Rule 43 of the Federal Rules of Criminal Procedure and the Due Process Clause; and (5) cumulative error.

The district court, after allowing the parties to fully brief the issues raised by Gonzalez, issued an order on February 25, 2009, denying Gonzalez's motion in its entirety. Final judgment was entered that same day.

Gonzalez filed a notice of appeal on March 27, 2009. On March 30, 2009, Gonzalez filed a request for a certificate of appealability (COA) on the five substantive issues asserted in his § 2255 motion, as well as a sixth issue of whether the district court erred in denying his § 2255 motion without first conducting an evidentiary hearing. On April 2, 2009, the district court issued an order granting Gonzalez a COA with respect to the second and third substantive issues asserted in his § 2255 motion, and denying his request for COA on the other four issues.

Gonzalez has now filed an appellate brief addressing the two issues on which the district court granted a COA. Gonzalez also requests that we grant him a COA with respect to the other four issues identified in the motion for COA he filed with the district court.

II

*A) Issues on which the district court granted COA*

6

As noted, the district court granted COA on two of the substantive issues identified in Gonzalez's § 2255 motion.  In considering those two issues on appeal, "[w]e review the district court's legal rulings . . . de novo and its findings of fact for clear error."  United States v. Orange, 447 F.3d 792, 796 (10th Cir. 2006).

*1. Trial counsel's failure to accept proposed instruction on withdrawal*

Gonzalez argues that his "[t]rial counsel's failure to accept the [trial] court's proposed jury instruction on the defense of withdrawal from the conspiracy fell below an objective standard of reasonableness and prejudiced [him]."  Aplt. Br. at 21.  According to Gonzalez, "[w]ithdrawal from the conspiracy was the only viable defense and refusing the instruction left the jury no choice but to convict on all counts."  Id.  Further, Gonzalez argues, "[t]his error was aggravated by the fact trial counsel conceded guilt to the conspiracy charges in his closing argument," which "[b]y law . . . amounted to a concession of guilt on every count alleged."  Id.  Gonzalez asserts that "[t]he result was a breakdown in the adversarial process and a corresponding violation of [his] right to the assistance of counsel and due process of law."  Id. at 21-22.  Gonzalez also argues he was prejudiced by trial counsel's conduct in this regard because "[i]f the jury would have heard evidence of and been instructed on withdrawal from the conspiracy and returned a verdict in conformity with that theory, the factual basis for [the trial court's] application of the weapon enhancement and role in the

7

offense adjustment would be undermined," Aplt. Br. at 20, and "the total offense level could have been reduced to as low as 35 resulting in a guideline range of imprisonment of 168 to 210 months, the minimum of which is less than one half of [his] current sentence." Id. at 20-21.

"A claim for ineffective of assistance of counsel presents a mixed question of fact and law, which we review de novo." Orange, 447 F.3d at 796. To establish ineffective assistance of counsel, a criminal defendant must demonstrate: (1) that his trial counsel was deficient such that he was deprived of "reasonably effective assistance"; and (2) that counsel's deficient performance prejudiced his case, meaning that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 687, 694 (1984). It is permissible for a reviewing court, if it so chooses, to proceed directly to the prejudice prong of the Strickland analysis. Id. at 697 ("If it is easier to dispose of an effectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."); see Romano v. Gibson, 239 F.3d 1156, 1181 (10th Cir. 2001) ("This court can affirm the denial of habeas relief on whichever Strickland prong is easier to resolve.").

The district court rejected Gonzalez's claim of ineffective assistance, stating:

> Defendant's claim that his trial counsel rendered ineffective

8

assistance by failing to accept the Court's proposed instruction (or any instruction) on the defense of withdrawal from a conspiracy is without merit. By refusing the instruction, Defendant's counsel was able to argue Defendant's withdrawal from the conspiracy without having to prove the legal requirements for that defense, of which there was no evidence. To have established the affirmative partial defense of withdrawal from the conspiracy charged in Count 1, and/or Count 29, Defendant would have had to prove by a preponderance of the evidence that "he took some definite, decisive and affirmative action to disavow the conspiracy or to defeat the purpose or goal of the conspiracy, either by reporting to the authorities or by communicating his intentions to his coconspirators." Court's Proposed Affirmative Defense of Withdrawal from a Conspiracy. See United States v. Parnell, 581 F.2s [sic] 1374, 1384 (10th Cir. 1978). See also Tenth Circuit Pattern Criminal Jury Instructions 2.22.

By rejecting the withdrawal instruction, Defendant's counsel avoided having to place his client on the stand to attempt to prove the defense, prevented the Government from countering the defense in its case-in-chief or otherwise and hoped to persuade the jury in closing argument that Defendant should not be convicted of any offenses committed by his coconspirators after Defendant moved to Florida, without having to prove the defense of withdrawal. In short, Defendant's trial counsel sought jury nullification of the Court's instruction on Vicarious Liability of Co-Conspirators for offenses committed by coconspirators after Defendant moved to Florida. Defendant's trial counsel's rejection of an instruction on withdrawal was clearly trial strategy. In any event, Defendant cannot show that he was prejudiced by his counsel's refusal to accept a withdrawal instruction because in view of the fact that there was no proof at trial of the necessary legal requirements for withdrawal, see above, there is no reasonable probability that the jury would have found that Defendant withdrew from the conspiracy charged in Count 1 and/or Count 29 when he moved to Florida in February of 2003 and acquitted him of the substantive counts committed thereafter by his coconspirators in furtherance of that conspiracy.

ROA, Vol. 1 at 458-59.

In his appellate brief, Gonzalez offers five reasons why the district court's

9

ruling was erroneous. First, Gonzalez asserts that, contrary to the conclusion reached by the district court, "[e]vidence was adduced at trial that supported the theory that . . . Gonzalez was no longer involved in the conspiracy after February 2003." Aplt. Br. at 24. In support of this assertion, Gonzalez cites to, but does not otherwise detail, testimony contained on fifteen pages of the nearly two-thousand page trial transcript. Id.

In addressing this argument, we note, as did the district court, that "[t]he defense of termination by withdrawal requires that the defendant show that he or she has done 'some act to disavow or defeat the purpose' of the conspiracy." United States v. Cherry, 217 F.3d 811, 817-18 (10th Cir. 2000) (quoting Hyde v. United States, 225 U.S. 347, 369 (1912)). "Affirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators have generally been regarded as sufficient to establish withdrawal . . . ." United States v. U.S. Gypsum Co., 438 U.S. 422, 464-65 (1978). With these legal requirements in mind, we conclude, having examined the cited testimony, as well as the entire trial transcript, that the evidence presented at trial was insufficient to have allowed the jury to reasonably find that Gonzalez withdrew from the conspiracy. In particular, we reject, for the reasons outlined below, each of the portions of testimony cited by Gonzalez:

• **Transcript pages 651-52.** These pages contain the cross-examination testimony of co-defendant Jennifer Lujan. Ms. Lujan testified for the government

10

on direct examination that she was a major distributor of methamphetamine during the years 2002 and 2003, and that Gonzalez was her main supplier during that time period. On the transcript pages now cited by Gonzalez, Ms. Lujan conceded that a photograph shown to her by Gonzalez's trial counsel was taken in September 2003 at a fair in Oklahoma City, and that Gonzalez "wasn't there . . . ." ROA, Vol. 7 at 652. Although Ms. Lujan's testimony in this regard perhaps implicitly confirms that Gonzalez was not present in Oklahoma City in September 2003, it says nothing about Gonzalez's involvement in, or withdrawal from, the charged conspiracy.

• **Transcript page 795.** Alex Figueroa, who went by the street name of "Toker," testified for the government that he met Boxer in 1991 in Southern California when each of them were members of different street gangs. Figueroa testified that he personally moved to Oklahoma City in early 2002, and that Gonzalez moved to Oklahoma City and began living with him in March or April of 2002. According to Figueroa, Gonzalez used at least two people, i.e., "Vago" and "Japo," to transport methamphetamine from California to Oklahoma City, and that, in turn, Gonzalez used a group of other people, including Jennifer Lujan, Liz Campos, and himself (Figueroa), to distribute the methamphetamine. On page 795 of the trial transcript, Figueroa testified on direct examination that he was arrested in February 2003, had remained incarcerated since that time, had not talked to Gonzalez after his arrest, and was not aware of whether or not Gonzalez

11

stayed in Oklahoma City after Figueroa's arrest. Nothing about this testimony would have remotely allowed the jury to find that Gonzalez withdrew from the charged conspiracy.

• **Transcript pages 1175-76.** Rafael Gamboa, who went by the street name of "Crook," testified at length on behalf of the government regarding Gonzalez's drug-trafficking activities. Gamboa testified at the outset that he had known Gonzalez all of his life and that the two of them were members of the Compton Varrio Tortilla Flats gang. Gamboa testified that in late 2002, he spoke with Gonzalez by telephone and agreed to become a partner in Gonzalez's Oklahoma City drug business. Following that conversation, Gamboa testified, he moved to Oklahoma City and became involved in the distribution of narcotics. Gamboa described, in detail, how Gonzalez obtained and in turn distributed drugs. Gamboa testified that when Gonzalez first left Oklahoma City and moved to Florida, "everything was falling apart," which is why Gonzalez wanted Gamboa to help out in Oklahoma City. ROA, Vol. 9 at 1083. On the transcript pages cited by Gonzalez, Gamboa testified on cross-examination that he personally escorted a load of methamphetamine from California to Oklahoma City in February or March 2003, and did not escort any other loads after that time. This testimony, considered either alone or collectively with the rest of Gamboa's testimony, is far from sufficient to have allowed the jury to find that Gonzalez withdrew from the charged conspiracy.

12

• **Transcript page 1354.** Maria Ginez, a co-defendant in this case, testified on behalf of the government against Gonzalez. Ginez explained at the outset that she had pled guilty to renting an apartment for use by conspiracy members Eduardo Verduzco and Elizabeth Serrano, and for laundering drug proceeds by way of Western Union wire transfers. Ginez also testified that she had a personal relationship with Gonzalez and that he was the father of her child. According to Ginez, she lived with Gonzalez in Miami and, while there, Gonzalez would take her to Western Union offices to pick up wire transfers of money from Oklahoma City. On trial transcript page 1354, Ginez testified that "[a]fter [she] got arrested, [she] didn't join [Gonzalez] in Miami anymore," but that, prior to her arrest, she also lived with Gonzalez in Washington, D.C. ROA, Vol. 10 at 1354. We see nothing in this cited testimony that would have supported a finding by the jury that Gonzalez withdrew from the conspiracy.

• **Transcript page 1427.** Mark Danner, an Oklahoma City Police Department officer assigned to work with a Drug Enforcement Administration task force, testified during the government's case-in-chief that he participated in the October 24, 2003 search of Maria Ginez's apartment in Oklahoma City, and he identified various items seized from Ginez's apartment that linked Ginez to Gonzalez. On the transcript page cited by Gonzalez in his appellate brief, Danner testified, on cross-examination, that Gonzalez left Oklahoma City on approximately February 28, 2003, and that their investigation had not identified

13

any money or accounts held by Gonzalez in Florida, California, or the Washington, D.C. area, where Gonzalez moved after living in Florida. Although Danner's testimony in this regard lends marginal support to Gonzalez's withdrawal theory, it is clearly insufficient, by itself, to fully establish the defense. More specifically, Danner's testimony does not establish either that Gonzalez completely withdrew from the conspiracy or that Gonzalez took some affirmative step to renounce or defeat the purpose of the conspiracy. E.g., United States v. Gonzalez, 797 F.2d 915, 916-17 (10th Cir. 1986).

• **Transcript pages 1444-45.** On these two cited transcript pages, Danner testified, on cross-examination, that the investigating law enforcement officers performed no wire taps during the time period from February 28, 2003, until October 28, 2003, because, at that time, they "[d]idn't even know that the organization existed for most of that time period." ROA, Vol. 10 at 1444-45. Importantly, the government's other testimony overwhelmingly established that the conspiracy did, in fact, continue between February and October 2003. Thus, as with the other Danner testimony discussed above, this testimony neither establishes that Gonzalez completely withdrew from the conspiracy nor took some affirmative step to renounce or defeat the purpose of the conspiracy.

• **Transcript page 1560.** Elizabeth Serrano, another co-defendant in the case, pled guilty to money laundering and one additional count, and agreed to testify on behalf of the government. Serrano testified that she and Eduardo

14

Verduzco (aka Lalo) first arrived in Oklahoma City in June or July 2003 while en route to Miami to visit Gonzalez. Serrano testified that she and Lalo stayed with Gonzalez in Florida for approximately one month, during which time Lalo and Gonzalez discussed using different names and obtaining false identification cards for those names. Serrano admitted that Lalo and Gonzalez were partners in selling drugs. According to Serrano, she and Lalo left Miami and began living in Oklahoma City in August of 2003. Thereafter, Serrano testified, Lalo engaged in the distribution of methamphetamine in Oklahoma City, and regularly conducted telephone conversations with Gonzalez. On the transcript page cited by Gonzalez, Serrano identified, on cross-examination, an exhibit memorializing a wire transfer to her on February 24, 2003 in the amount of $999. ROA, Vol. 11 at 1560. Clearly, this testimony does not support Gonzalez's withdrawal defense.

• **Transcript pages 1695-99.** Bob Summers, a special agent with the Internal Revenue Service's Criminal Investigation Division, became involved in the investigation of the conspiracy in December 2003, and tracked the pattern of wire transfers from Western Union locations in Oklahoma to Western Union locations in California and Florida. On the transcript pages cited by Gonzalez in his appellate brief, Summers testified on cross-examination that the majority of the wire transfer money (totaling approximately $245,000) went to California, that records indicate Jennifer Lujan wire-transferred money to Florida after Gonzalez moved there, that it was possible that Gonzalez made money as a tattoo

15

artist but didn't report it to the IRS, and that it would not be unusual for a person on the run from law enforcement officers to fail to file a federal tax return (Gonzalez did not file a federal tax return for the tax year 2003).  Notably, Gonzalez makes no attempt to explain how any of this evidence would have supported his withdrawal defense, and we conclude none of it would have allowed the jury to reasonably find the necessary elements of withdrawal.

Thus, in sum, we agree with the district court that the evidence presented at trial was insufficient to allow the jury to reasonably find that Gonzalez withdrew from the conspiracy.

Gonzalez next argues, relatedly, that "[t]he district court's holding on post conviction [that] there was no evidence to support a withdrawal from the conspiracy instruction is contrary to the court's view at the time of trial."  Aplt. Br. at 25.  Gonzalez is, however, mistaken in this regard.  A review of the trial transcript indicates that the district court suggested the possibility of a withdrawal from conspiracy instruction only after hearing the closing arguments of Gonzalez's counsel.  In those closing arguments, Gonzalez's counsel asserted that Gonzalez, after leaving Oklahoma City in February 2003, was unaware of what was happening regarding methamphetamine trafficking in Oklahoma City, and that Eduardo Verduzco was the person responsible for running the conspiracy. Importantly, at no time during the trial proceedings did the district court rule on whether the evidence presented at trial was sufficient to allow the jury to find that

16

Gonzalez in fact withdrew from the conspiracy. Moreover, a defense counsel's closing argument suggesting withdrawal, in the absence of supporting evidence, provides no basis for a jury to find withdrawal.[1] See United States v. Atencio, 435 F.3d 1222, 1237 (10th Cir. 2006) (characterizing as "standard" an instruction "emphasizing that 'any statements, objections, or arguments made by the lawyers are not evidence.'").

In his third argument, Gonzalez argues that, "contrary to the district court's holding, accepting the withdrawal from conspiracy instruction could not have altered the government's case in chief, the government's examination of witnesses, or Mr. Gonzalez's decision not to testify." Aplt. Br. at 25. Although Gonzalez is correct, that does not alter the fact that the evidence presented at trial was insufficient to allow the jury to reasonably find that Gonzalez withdrew from the conspiracy.

In his fourth argument, Gonzalez challenges as "flawed" "[t]he district court's conclusion that rejecting the instruction was 'clearly trial strategy' because 'trial counsel sought jury nullification of the Court's Instruction on Vicarious Liability of Co-Conspirators for offenses committed by coconspirators after [Gonzalez] moved to Florida . . . .'" Aplt. Br. at 25 (quoting ROA, Vol. 1 at 459). According to Gonzalez, "[i]t is not 'trial strategy' to seek jury nullification

---

[1] The district court recognized this principle when it instructed the jury that "[s]tatements and arguments of counsel are not evidence in the case." ROA, Vol. 1 at 183.

17

because it is improper for counsel to promote such a result." Id.

Although the legal premise of Gonzalez's argument is correct, in that we disapprove of the encouragement of jury nullification, e.g., United States v. Trujillo, 714 F.2d 102, 106 (11th Cir. 1983) ("While we recognize that a jury may render a verdict at odds with the evidence or the law, neither the court nor counsel should encourage jurors to violate their oath."), we disagree with the factual premise of his argument. More specifically, we are not persuaded, after reviewing the record on appeal, that Gonzalez's trial counsel was encouraging jury nullification. Given the overwhelming evidence of guilt presented by the government, Gonzalez's trial counsel was quite limited in what he could argue to the jury, and obviously realized that Gonzalez could not, based upon the available evidence, satisfy the legal requirements of the withdrawal defense. As the district court concluded, trial counsel's best strategic choice, indeed perhaps his only choice, was to argue that Gonzalez no longer had any involvement with the conspiracy after he moved to Florida, but without specifically arguing the legal requirements of a withdrawal defense. In other words, trial counsel, rather than taking on the insurmountable burden of establishing the legal defense of withdrawal, simply attempted to put the government to its burden of proof by relying on the district court's general instructions on conspiracy and arguing that he was no longer part of the conspiracy after a certain date. Although Gonzalez now takes issue with this strategy, he fails to point to any evidence from which

18

the jury could reasonably have found the existence of the legal requirements of the withdrawal defense.

Finally, and relatedly, Gonzalez argues that his counsel's "refusal to accept the instruction prevented the jury from deliberating" whether Gonzalez remained criminally responsible for the post-February 2003 actions of his coconspirators "and deprived [him] of the opportunity to present the only possible defense under the law and facts." Aplt. Br. at 27. Although we agree that trial counsel's rejection of the withdrawal instruction prevented the jury from considering the legal elements of the withdrawal defense, we readily conclude that Gonzalez was not prejudiced as a result thereof, given the overwhelming evidence of his guilt and the complete lack of evidence that he withdrew from the conspiracy or took some affirmative step to renounce or defeat the purpose of the conspiracy.

In conclusion, we agree with the district court that Gonzalez failed to establish that his counsel's rejection of the district court's proffered withdrawal instruction deprived him of his constitutional right to the effective assistance of counsel.

*2. Trial counsel's concession of Gonzalez's guilt*

In the second issue on which the district court granted a COA, Gonzalez argues that his trial counsel's concession of guilt to the conspiracy charge, "a count that encompassed every other count in the indictment," effectively "caused a breakdown in the adversarial process and, correspondingly, violated [his] right

19

to the assistance of counsel." Aplt. Br. at 29. In addition, Gonzalez argues, his counsel's concession of guilt "relieved the government of its burden of proving [him] guilty beyond a reasonable doubt," "thereby violating [his] right to due process of law." Id.

*a. Right to assistance of counsel*

In United States v. Cronic, 466 U.S. 648 (1984), the United States Supreme Court "recognized a limited exception to Strickland," Crawley v. Dinwiddie, 584 F.3d 916, 922 n.8 (10th Cir. 2009), by holding that "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." 466 U.S. at 659. In other words, "Cronic held that a Sixth Amendment violation may be found without inquiring into counsel's actual performance or requiring the defendant to show the effect it had on the trial, when circumstances [exist] that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified . . . ." Wright v. Van Patten, 552 U.S. 120, 124 (2008) (per curiam) (internal quotation marks and citations omitted; brackets in original). Importantly, the Court has since "made clear that . . . 'the attorney's failure [to subject the prosecution's case to meaningful adversarial testing] must be complete.'" Id. at n.* (quoting Bell v. Cone, 535 U.S. 685, 697 (2002)). Thus, although we have held that "the admission by counsel of his client's guilt to the jury . . . represents a paradigmatic

20

example of the sort of breakdown in the adversarial process that triggers a presumption of prejudice" under Cronic, United States v. Williamson, 53 F.3d 1500, 1511 (10th Cir. 1995), it is clear that, in order to implicate the Cronic presumption, any such admission by counsel must be complete. E.g., Hale v. Gibson, 227 F.3d 1298, 1323 (10th Cir. 2000) (concluding that Cronic was not implicated where defense counsel "made a reasonable strategic decision to concede some guilt by [petitioner], given the overwhelming evidence presented at trial, and focused on the extent of [petitioner's] involvement and whether others could have been involved."); Trice v. Ward, 196 F.3d 1151, 1161-62 (10th Cir. 1999) (same). We "have found a complete absence of meaningful adversarial testing only where the evidence overwhelmingly established that [the] attorney abandoned the required duty of loyalty to his client, and where counsel acted with reckless disregard for his client's best interests and, at times, apparently with the intention to weaken his client's case." Turrentine v. Mullin, 390 F.3d 1181, 1208 (10th Cir. 2004) (internal quotation marks omitted; brackets in original).

Whether a complete admission of guilt "actually occurred is necessarily fact-intensive." Williamson, 53 F.3d at 1511. "The focus must be on whether, in light of the entire record, the attorney remained a legal advocate of the defendant who acted with undivided allegiance and faithful, devoted service to the defendant." Id. (internal quotation marks omitted).

The district court in this case properly acknowledged these principles, and

21

in turn concluded

> that the <u>Cronic</u> presumption of prejudice d[id] not apply, that Defendant's trial counsel's concession of Defendant's guilt of Count 1, at least up to the point he moved to Florida, was reasonable trial strategy in light of overwhelming evidence of Defendant's guilt as to Count 1. Defendant's counsel was present in the courtroom, conducted cross-examination, made evidentiary objections and gave opening and closing arguments. Hence, Defendant's counsel did not abandon his duty of loyalty to Defendant or act in reckless disregard of his client's best interest, triggering the <u>Cronic</u> presumption. Moreover, Defendant's counsel's concession of Defendant's guilt on Count 1 at least until, as counsel argued, Defendant moved to Florida, in light of overwhelming evidence of Defendant's membership and participation in the conspiracy, so as to gain credibility with the jury and attempt to persuade them Defendant was not guilty of at least some of the substantive offenses, particularly those that occurred after February of 2003, was reasonable trial strategy.

ROA, Vol. 1 at 463-64.

Gonzalez argues that the district court's conclusion was erroneous because, in light of the jury instructions, particularly one discussing the vicarious liability of coconspirators, defense counsel's "concession that Mr. Gonzalez was guilty of conspiracy, the overarching and most serious charge in the indictment, had the practical effect of denying Mr. Gonzalez his right to a jury determination, on all of the counts in the indictment."[2] Aplt. Br. at 32. We disagree.

---

[2] Gonzalez also argues that "[a]ny possibility the jury might reach a different conclusion was destroyed when [defense counsel] declined the Court's offer to instruct the jury on his only defense," and "[i]f the jury had been instructed on the defense of withdrawal from the conspiracy, there would have been a possibility of [him] being acquitted on the counts involving conduct that occurred after he moved to Florida in February 2003." Aplt. Br. at 32. For the

(continued...)

To be sure, the district court instructed the jury that "[e]very conspirator is guilty of the illegal acts that are done as part of and in furtherance of the conspiracy even though those acts are done solely by coconspirators." ROA, Vol. 1 at 249. There was more, however, to the vicarious liability instruction. In particular, that instruction stated:

> If you are satisfied beyond a reasonable doubt that, at the time an alleged offense was committed, a Defendant had entered into <u>and continued to be a member</u> of an unlawful conspiracy as charged in Count 1 and as I have defined that for you and if you further find beyond a reasonable doubt that the alleged acts charged in any of Counts 2, 3, 4, 5, 6, 7, 8, 10, 11, 12, 14, 15, 16, 19, 21, 22, 26, 27, 29 and 30 through 79 were committed while the conspiracy continued to exist and in furtherance of that unlawful conspiracy or as an object of that conspiracy, then you may find that Defendant guilty of the offense or offenses charged in such count or counts even though he was not the person who actually committed or personally aided and abetted in the commission of that offense or those offenses.

Id. (emphasis added).[3]

Gonzalez's trial counsel obviously attempted to take advantage of the highlighted phrase in the vicarious liability instruction by arguing that Gonzalez was merely a "lieutenant" in the conspiracy, ROA, Vol. 16 at 35, that Lalo (Eduardo Verduzco) was the one actually in charge of the conspiracy, id., that

---

[2](...continued)
reasons already discussed above, these arguments have no merit.

[3] The district court also instructed the jury that "[e]ach crime or offense as charged and the evidence applicable thereto, should be considered separately, and the guilt or innocence of a Defendant as to each count or offense should likewise be considered separately." ROA, Vol. 1 at 232.

Gonzalez ceased to be a member of the conspiracy after he moved to Florida in February of 2003, id. at 70 ("Once Boxer [Gonzalez] leaves Oklahoma, Lalo [Verduzco] is not keeping him up to speed on the day-to-day business. Boxer [Gonzalez] doesn't know what's going on in Oklahoma."), and that, necessarily, Gonzalez was not responsible for any of the substantive offenses that occurred after February of 2003. In other words, as the district court concluded, Gonzalez's counsel clearly attempted, by way of his cross-examination of the government's witnesses and his closing arguments, to challenge Gonzalez's guilt on the post-February 2003 substantive counts, and did not, as asserted by Gonzalez, effectively concede Gonzalez's guilt on those counts.

Gonzalez also complains, in passing, that his trial counsel's opening statement, which denied guilt as to any of the charges, was inconsistent with trial counsel's closing arguments (which, as noted, conceded guilt to the conspiracy charge). Aplt. Br. at 32-33. For the reasons already discussed, however, we conclude this inconsistency does nothing to bolster his Cronic claim.

b. Due process

Gonzalez also argued that his trial counsel's concession of guilt to the conspiracy charge, during closing arguments, violated his due process rights by relieving the government of its burden of proof. The district court rejected this argument, stating:

Whether Defendant's counsel's concession of his client's guilt as

24

to Count 1 amounted to a violation of the Due Process Clause is determined by the standards set forth above [i.e., Strickland and Cronic]. See United States v. Swanson, 943 F.2d 1070, 1073 (9th Cir. 1991). It is only when "a defense attorney concedes that there is no reasonable doubt concerning the only factual issues in dispute, [that] the Government has not been held to its burden of persuading the jury that the defendant is guilty." Id. That is not what occurred here and the disposition of Defendant's claim of ineffective assistance of counsel under the Sixth Amendment, based on his concession of Defendant's guilt of Count 1, governs the disposition of that claim under the Due Process Clause.

ROA, Vol. 1 at 465.

On appeal, Gonzalez does not specifically challenge the district court's ruling. Instead, he argues simply that his counsel's "concession of guilt on the conspiracy charges amounted to a concession of guilt on all charges pursuant to the vicarious liability principles governing conspiracy," and thereby "relieved the government of its burden to prove guilt beyond a reasonable doubt." Aplt. Br. at 34.

As the district court noted, however, the disposition of Gonzalez's Cronic claim also effectively disposes of his due process claim. More specifically, because the record indicates that Gonzalez's trial counsel challenged Gonzalez's guilt on the post-February 2003 substantive counts, it is apparent that the government was not wholly relieved of its burden of proof.

## B. Issues on which Gonzalez seeks a COA

Gonzalez seeks a COA on four additional issues. The issuance of a COA is a jurisdictional prerequisite to an appeal from the denial of an issue raised in a §

25

2255 motion. Miller-El v. Cockrell, 537 U.S. 322, 336 (2003). A COA may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2553(c)(2). To make such a showing, an applicant must demonstrate "that reasonable jurists could debate whether (or, for that matter, agree that) the [particular issue raised in the] petition should have been resolved in a different manner or that the issue[] presented w[as] adequate to deserve encouragement to proceed further." Slack v. McDaniel, 529 U.S. 473, 484 (2000) (citation and internal quotation marks omitted).

*1. Trial counsel's failure to investigate and present evidence*

In the first issue on which he seeks a COA, Gonzalez contends that his trial counsel failed to investigate and call at trial Marlene Gonzalez (his ex-wife) and Eduardo Verduzco, both of whom Gonzalez asserts would have testified in support of his defense theory of withdrawal from the conspiracy. Gonzalez argues that if the jury had been persuaded that he withdrew from the conspiracy in February 2003, his advisory guideline range of punishment would have been reduced by half.

The district court concluded that trial counsel's failure to call these two witnesses was not prejudicial:

> The Court agrees with the Government that the testimony of
> Defendant's ex-wife, as proffered by defense counsel, would not
> have assisted or had any real impact on Defendant's theory of
> defense that he withdrew from the conspiracy in February of 2003.
> While the testimony of Edward Verduzco, had he been called as a

26

witness, as set forth in the Declaration of Eduardo Verduzco, would have supported Defendant's theory of defense, it was contradicted by overwhelming evidence. While the evidence at trial was that Dennis Gonzalez a/k/a Boxer left Oklahoma City in February 2003 after the arrest of one of his associates, Alex Figueroa a/k/a Toker, Gonzalez maintained control of drug trafficking in Oklahoma, even though he had moved to Florida. Couriers continued to bring crystal methamphetamine and other controlled substances to Oklahoma City for distribution at the direction of Dennis Gonzalez.

Fourteen cooperating witnesses testified at trial concerning their knowledge of Defendant's role in arranging for large amounts of methamphetamine and other drugs to be brought from California to the Oklahoma City area for distribution and the transfers of funds obtained from that enterprise. Sixteen law enforcement officers, agents or employees and numerous business records custodians testified to corroborating evidence that included telephone records, airline and other travel records, employment records, documents and photographs obtained in searches of co-conspirators and their residences, Western Union wire transfer records, photographs provided by cooperating witnesses and large quantities of crystal methamphetamine seized from Jennifer Lujan and thrown out a window by Eduardo Verduzco on October 23, 2003.

The testimony of witnesses was corroborated by documents introduced at trial, including an address book with the name of "Box on it that also contained drug ledgers and a drug ledger that showed money beside the name "Box," all of which were found during a search of the apartment occupied by Eduardo Verduzco and Elizabeth Serrano on October 23, 2003. The apartment had been rented for Verduzco by Maria Ginez, Defendant's girlfriend, at Defendant's direction.

Moreover, there was significant evidence that after Defendant moved to Florida in February 2003, transfers of money totalling [sic] $69,972 from drug trafficking were sent by Oklahoma conspirators to Florida. Defendant's girlfriend, Maria Ginez, testified that while she was living in Florida after February of 2003 and before her arrest in October of 2003, Ms. Ginez would pick up money sent by Western Union wire transfer and give it to Defendant.

27

In the face of this evidence, which also led to Defendant's conviction on money laundering counts that occurred after March, 2003, Defendant cannot show a reasonable probability that the result of the proceeding would have been different with respect to the substantive counts committed after February of 2003 for which Defendant was vicariously liable as a coconspirator.

ROA, Vol. 1 at 455-58.

The district court's conclusions are well-supported by the record on appeal, particularly the trial transcript. As the district court expressly noted, the evidence of Gonzalez's guilt on the charges at issue was overwhelming. In turn, Gonzalez simply cannot establish that he was prejudiced by his trial counsel's failure to present either his ex-wife or Eduardo Verduzco as witnesses on his behalf. We therefore conclude that Gonzalez has failed to establish his entitlement to a COA on the issue.

### 2. *Defendant's right to be present at in-chambers conference*

In the second issue on which he seeks a COA, Gonzalez contends that his absence from an untranscribed, in-chambers conference during which his counsel and the trial court discussed whether he consented to his trial counsel's concession of partial guilt to the conspiracy charge violated his right to be present under Rule 43 of the Federal Rules of Criminal Procedure and the Due Process Clause.

The district court concluded this claim was "without merit." ROA, Vol. 1 at 465. More specifically, the district court stated:

28

The Court's inquiry to Defendant's counsel occurred at one of the in-chambers conferences the Court held to consider written responses to be made to written questions received from the jury during their deliberations. At such conferences, the Court reviewed his proposed response with all counsel to ascertain their agreement or objection or conferred with counsel to reach an agreed response to a jury question. None of these conferences was on the record because there was no disagreement on the responses to be sent back to the jury. Defendant was not present at any of these conferences. During one of these conferences, while the judge and counsel waited for a drafted response to a jury question to be typed, the court and counsel engaged in a general conversation regarding the trial and the use of computer and power point aids at trial. It was during such general conversation that the court inquired of Defendant's counsel as to whether Defendant had consented to counsel's discussion in closing argument of Defendant's guilt to a portion of the conspiracy charge. The Court was not obligated to make this inquiry. And Defendant did not have a right under Rule 43, F.R.Crim.P., or the Due Process Clause to be present at the Court's conferences regarding questions received from the jury during their deliberations. Such conferences may be considered an extension of jury instruction conferences and deal with questions of law or administrative matters. See F.R.Crim.P. 43(b)(3); Esnault v. Colorado, 980 F.2d 1335, 1337 (10th Cir. 1992) (defendant does not have a due process right to be present when counsel and the court confer on a question from a deliberating jury or when a type-written response is given to that jury question); Larson v. Tansy, 911 F.2d 392, 394 (10th Cir. 1990) (rarely can a defendant establish that a jury instruction conference which traditionally addresses purely legal issues, is a conference for which his presence is essential to his opportunity to present a defense).

Id. at 465-66.

In our view, reasonable jurists could not debate whether Federal Rule of Criminal Procedure 43 afforded Gonzalez the right to be personally present during the in-chambers conference at issue. To be sure, Rule 43(a)(2) provides that a criminal defendant "must be present at . . . every trial stage, including jury

29

impanelment and the return of the verdict," and the Supreme Court has held that this provision guarantees a criminal defendant the right to have a jury's question "answered in open court" and for his counsel to be "given the opportunity to be heard before the trial judge respond[s]" to the question. Rogers v. United States, 422 U.S. 35, 39 (1975). Subsection (b)(3) of Rule 43 also provides, however, that a criminal defendant "need not be present" if "[t]he proceeding involves only a conference or hearing on a question of law." Fed. R. Crim. P. 43(b)(3). Here, the in-chambers conference concerned only a legal question of how to properly respond to a jury question. Thus, under Rule 43(b)(3), Gonzalez's presence was not necessary. Moreover, according to the district court's uncontroverted factual findings, the conversation at issue between the trial judge and Gonzalez's trial counsel occurred during a lull in the conference, and thus was arguably not even a pertinent part of the in-chambers conference. Although Gonzalez asserts that "the proceeding shifted from a hearing on a question of law to one that involved a question of fact directly affecting [his] right to a fair trial," Aplt. Br. at 43, there is no factual support for that assertion. Indeed, the district court specifically found that the conversation at issue occurred while the court and parties were waiting for the agreed response to the jury's question to be transcribed, and there is no indication that the conversation had any impact whatsoever on the proceedings.

Similarly, we conclude that reasonable jurists could not debate whether

30

Gonzalez had a due process right to be present during the in-chambers conference. In United States v. Gagnon, 470 U.S. 522 (1985), the Supreme Court noted that a criminal "defendant has a due process right to be present at a proceeding 'whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge,'" and that "'[t]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only.'" Id. at 526 (quoting Snyder v. Massachusetts, 291 U.S. 97, 105-06 (1934)). Applying those principles to Gonzalez's case, it is clear that a fair and just hearing on the jury's question would not have been thwarted by his absence, and thus Gonzalez did not have a due process right to be present at the in-chambers conference on the question. Further, the discussion that occurred between the district court and defense counsel had no impact on the district court's response to the jury's question, or to any other matter at issue before the district court. Gonzalez has thus failed to establish his entitlement to a COA.

*3. Cumulative error*

Gonzalez contends he is entitled to a COA on the cumulative error issue he raised below. We disagree. Because we have found no merit to any of the issues raised by Gonzalez, there is no basis for applying a cumulative error analysis. See United States v. Rivera, 900 F.2d 1462, 1470 (10th Cir. 1990) (en banc) ("a cumulative-error analysis aggregates only actual errors to determine their

31

cumulative effect").

*4. Failure to conduct evidentiary hearing*

Finally, we reject Gonzalez's contention that he is entitled to a COA on the question of whether the district court erred by failing to conduct an evidentiary hearing on any of the issues raised by Gonzalez in his § 2255 motion. Having carefully examined the record on appeal, we readily conclude that there were no relevant, disputed issues of fact that needed to be resolved, and in turn no need for an evidentiary hearing. Thus, his request for a COA on this issue is rejected.

The judgment of the district court is AFFIRMED. Gonzalez's request for a COA on additional issues is DENIED.