F I L E D
**United States Court of Appeals
Tenth Circuit**

**May 2, 2006**

**Elisabeth A. Shumaker
Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

vs.

KEITH LAMAR ORANGE,

      Defendant - Appellant.

No. 05-6105

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. No. CIV-01-1606-L)**

Kerry A. Kelly, Assistant U.S. Attorney (and John C. Richter, U.S. Attorney, on the briefs), Oklahoma City, Oklahoma, for Plaintiff - Appellee.

Gary S. Peterson, Oklahoma City, Oklahoma, for Defendant - Appellant.

Before **KELLY**, **BRISCOE**, and **McCONNELL**, Circuit Judges.

**KELLY**, Circuit Judge.

     Petitioner-Appellant Keith Lamar Orange, appeals from the district court's

denial of his 28 U.S.C. § 2255 petition based on claims of ineffective assistance

of counsel. United States v. Orange, 364 F. Supp. 2d 1288 (W.D. Okla. 2005).

On appeal, Mr. Orange argues that his trial counsel was ineffective because he failed to challenge the jury composition of Mr. Orange's grand and petit juries, and did not do any factual investigation. Mr. Orange maintains that this professionally unreasonable decision prejudiced him because a jury composition challenge would have succeeded. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

**Background**

On March 18, 1998, a federal grand jury in the Western District of Oklahoma indicted Mr. Orange on one count of conspiracy to defraud the United States in violation of 18 U.S.C. § 286, and five counts of filing and causing a false claim to be presented to a United States agency, in violation of 18 U.S.C. § 287 & 18 U.S.C. § 2. The case was based on Mr. Orange's substantial participation in "an elaborate scheme operated from prison to file fraudulent income tax returns seeking refunds." United States v. Orange, No. 99-6009, 2000 WL 757735, at *1 (10th Cir. June 12, 2000) (unpublished). On August 27, 1998, following a four day trial, a jury convicted Mr. Orange on these counts. The district court sentenced Mr. Orange to 78 months imprisonment on the conspiracy count and 60 months imprisonment on the remaining counts, all sentences to run concurrently. The court also imposed a three year term of supervised release. His

conviction was upheld on direct appeal, and the Supreme Court denied certiorari. Orange v. United States, 531 U.S. 939 (2000).

Proceeding pro se, Mr. Orange filed a motion pursuant to 28 U.S.C. § 2255 on October 11, 2001, raising a variety of claims. R. Doc. 294. Pertinent to this case, Mr. Orange challenged the district's jury selection process, both facially and as applied, as violative of his Sixth Amendment right to a fair cross section and his Fifth Amendment right to equal protection. R. Doc. 294 at 6-10. Mr. Orange also alleged ineffective assistance of counsel, because of his trial counsel's failure to challenge the ethnic composition of Mr. Orange's jury. R. Doc. 299 at 2. The district court denied relief, R. Doc. 302, finding that Mr. Orange failed to demonstrate a systematic exclusion of a group or that the district's use of voter registration lists as the source for the master jury wheel names was constitutionally or statutorily unsound. R. Doc. 301 at 4.

Mr. Orange appealed, and this court denied Mr. Orange's request for a certificate of appealability ("COA") on all issues and dismissed the appeal. United States v. Orange, No. 02-6112, 2002 WL 31341552 (10th Cir. Oct. 18, 2002) (unpublished). In dismissing the appeal, the panel determined that (1) Mr. Orange failed to make a sufficient showing on either his facial or as-applied challenges to jury composition and (2) having found that the jury composition challenges were without merit, counsel was not ineffective for failing to raise

- 3 -

them.  Id. at *3.

On rehearing, a split panel reversed the district court's ruling on Mr. Orange's ineffective assistance of counsel claim as it related to the jury composition issue.  R. Doc. 312 at 4.  This court instructed the district court to (1) determine whether trial counsel's failure to challenge the jury composition was strategic, and if not, (2) investigate the merits to determine whether Mr. Orange can show deficient performance and prejudice sufficient to establish ineffective assistance of counsel.  Id. at 4-5.

The district court appointed counsel and held evidentiary hearings over several days, wherein it was established that prior to trial, Mr. Orange asked his counsel, Stan Parsons, to pursue a jury composition challenge.  Tr. Vol. 1[1] at 14-16, 49-50.  Mr. Parsons testified that in response to Mr. Orange's request, he undertook legal research and, based on that research, concluded a jury composition challenge was unlikely to succeed.  Id. at 16-18.  Mr. Parsons visited with Mr. Orange, shared his research and did not recall Mr. Orange bringing up the subject again.  Id. at 18.  Not surprisingly, Mr. Orange remembered the events differently.  He testified that after he brought up the jury composition motion with

---

[1]  The hearing transcripts contain a record volume number and a transcript volume number.  For the purposes of this opinion, Tr. Vol. 1 refers to the transcript dated January 8, 2004, Tr. Vol. 2 refers to the transcript dated February 25, 2004, and Tr. Vol. 3 refers to the transcript dated January 18, 2005.

Mr. Parsons, Mr. Parsons "never mentioned it again." Id. at 50. Mr. Orange testified that he followed up with Mr. Parsons, who told him he "hadn't got around to it." Id. Mr. Orange also claimed he asked Mr. Parsons to object to the jury composition on the first day of trial and Mr. Parsons responded that it was too late. Id. at 51. On February 25, 2004, the district court heard testimony about the practice in the Western District of Oklahoma regarding factual investigation into jury composition issues and the rarity of such requests.

On January 18, 2005, the district court held a hearing to address the Western District's jury selection method and relevant statistical analysis. The district has four divisions for jury selection purposes, and a jury wheel is maintained for each of the divisions. Tr. Vol. 3 at 21-22. To create the master jury wheel, the clerk's office randomly and publicly selects a starting number. The master jury wheel contains only names and addresses. Every sixteenth name thereafter is selected. Id. at 44-45. The clerk's office sends out juror questionnaires to the people whose names are drawn in order to create the qualified jury wheel. Id. at 24-25.[2] Only jurors who return the questionnaires are included on the qualified jury wheels. Both the master and qualified jury wheels

---

[2] A qualified juror must be a U.S. citizen, at least 18 years of age, be a district resident for at least one year, be able to read, write and understand English, be mentally and physically competent, and not have been convicted of a felony or have charges pending. Id. at 33-34.

are created on a random basis.  Id. at 35-36.

The district court heard expert testimony and received exhibits on the racial composition of the 1993 and 1997 jury wheels.[3]  The 1993 district wide[4] qualified wheel was comprised as follows:

| Distinctive Group | Black | Indian | Asian | Hispanic |
|---|---|---|---|---|
| Percentage of voting age population (1990 Census) | 7.40 | 4.21 | 1.47 | 3.02 |
| Percentage of qualified venire | 4.78 | 2.66 | .67 | 1.36 |
| Absolute Disparity | 2.62 | 1.55 | .80 | 1.66 |
| Comparative Disparity | 35.41 | 36.82 | 54.41 | 54.97 |

Orange, 364 F. Supp.2d at 1295; Aplt. Br. at 14; Aplee. Br. Addendum at unnumbered 28.  The 1997 qualified wheel for the Oklahoma City division (where Mr. Orange's petit jury was selected from) was comprised as follows:

_____

[3]  The 1997 grand jury that indicted Mr. Orange was randomly drawn from the 1993 qualified jury wheel.  The petit jury that heard Mr. Orange's 1997 trial was drawn from the 1997 qualified wheel.

[4]  Grand jurors are chosen district-wide, not within the individual divisions.

| Distinctive Group | Black | Indian | Asian | Hispanic |
|---|---|---|---|---|
| Percentage of voting age population (1990 census) | 8.63 | 4.27 | 1.64 | 2.74 |
| Percentage of qualified venire | 5.06 | 2.64 | .80 | 1.49 |
| Absolute Disparity | 3.57 | 1.63 | .84 | 1.25 |
| Comparative Disparity | 41.37 | 38.17 | 51.22 | 45.62 |

Orange, 364 F.Supp.2d at 1295; Aplt. Br. at 12; Aplee. Br. Addendum at unnumbered 28. On appeal, these numbers are undisputed.

The district court held that Mr. Orange could not establish any prejudice resulting from counsel's performance, and first declined to decide whether that performance was deficient. Orange, 364 F. Supp. 2d. at 1298. Immediately thereafter, the district court noted that Mr. Parsons certainly viewed his decision not to challenge the jury selection procedure as strategic, and then indicated that such a decision was not deficient performance. Id. This appeal followed.

**Discussion**

We review the district court's legal rulings on a § 2255 motion de novo and

its findings of fact for clear error. United States v. Pearce, 146 F.3d 771, 774 (10th Cir. 1998). A claim for ineffective assistance of counsel presents a mixed question of fact and law, which we review de novo. Boltz v. Mullin, 415 F.3d 1215, 1221 (10th Cir. 2005).

In order to establish a successful claim for ineffective assistance of counsel, Mr. Orange must show (1) that counsel's performance was deficient, and (2) that this deficient performance prejudiced his defense, depriving him of a fair trial with a reliable result. Strickland v. Washington, 466 U.S. 668, 687 (1984). Here, Mr. Orange claims ineffective assistance, based on counsel's failure to file a motion or object based on jury composition. Because Mr. Orange must demonstrate both Strickland prongs to establish his claim, id. at 692, a failure to prove either one is dispositive. Smith v. Robbins, 528 U.S. 259, 286 n.14 (2000) (quoting Strickland, 466 U.S. at 697) ("The performance component need not be addressed first. 'If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.'"); see also Romano v. Gibson, 239 F.3d 1156, 1181 (10th Cir. 2001) ("This court can affirm the denial of habeas relief on whichever Strickland prong is the easier to resolve.").

To satisfy the prejudice prong, Mr. Orange must show that there is a reasonable probability that but for counsel's alleged errors, the result of the

proceeding would have been different. Strickland, 466 U.S. at 694; see also

Sallahdin v. Gibson, 275 F.3d 1211, 1235 (10th Cir. 2002); Hickman v. Spears,

160 F.3d 1269, 1273 (10th Cir. 1998). When, as here, the basis for the ineffective

assistance claim is the failure to raise an issue, we must look to the merits of the

omitted issue. See Jones v. Gibson, 206 F.3d 946, 959 (2000). If the omitted

issue is without merit, then counsel's failure to raise it is not prejudicial, and thus

is not ineffective assistance. Id. Assuming, arguendo, that counsel's performance

was deficient, Mr. Orange cannot establish prejudice because his jury composition

claim would have failed on the merits.[5]

As such, we now turn to the merits of Mr. Orange's jury composition claim.

The district court's factual determinations relevant to the jury composition claim

are reviewed for clear error and its legal determination of whether a prima facie

violation of the fair cross section requirement has occurred is reviewed de novo.

United States v. Shinault, 147 F.3d 1266, 1271 (10th Cir. 1998). The Sixth

Amendment guarantees a defendant the right to a jury pool consisting of a fair

cross section of the community. Taylor v. Louisiana, 419 U.S. 522, 538 (1975);

United States v. Gault, 141 F.3d 1399, 1402 (10th Cir. 1998).[6] A defendant has

_____

[5] We need not decide whether the district court decided the deficient performance issue and whether that resolution was correct. Examination of Strickland's prejudice prong is sufficient to resolve the matter.

[6] Claims of violation of the Jury Selection and Service Act, 28 U.S.C. §§ 1861-1869, are evaluated under the Sixth Amendment standard. Shinault, 147

no constitutional right to a jury composed in whole or in part of persons of his race. Beachum v. Tansy, 903 F.2d 1321, 1331 (10th Cir. 1990).

To establish a violation of the fair cross section requirement, Mr. Orange must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under-representation is due to *systematic* exclusion of the group in the jury-selection process. Duren v. Missouri, 439 U.S. 357, 364 (1979). The Fifth Amendment requires a substantially similar showing, that the district's system resulted in substantial under-representation of a distinct group over a substantial period of time. Casteneda v. Partida, 430 U.S. 482, 494 (1977); Gault, 141 F.3d at 1402.

There is no dispute that Mr. Orange satisfied the first Duren element, Aplee. Br. at 28, and we note that he need not belong to one of the distinctive groups to have standing to challenge the fair cross section, Taylor, 419 U.S. at 526. We next consider whether the distinctive groups' representation is fair and reasonable in relation to their representation in the community. In order to make this determination, we have consistently relied upon two measurements: absolute and comparative disparity. Shinault, 147 F.3d at 1272; Gault, 141 F.3d at 1401-

F.3d at 1270.

02; United States v. Yazzie, 660 F.2d 422, 426 (10th Cir. 1981). We have explained these measures:

> Absolute disparity is determined by subtracting the percentage of a group in the jury wheel from the percentage of that same group in the general population. Comparative disparity is determined by dividing the absolute disparity of a group by the percentage of that group in the general population.

Gault, 141 F.3d at 1402 (internal citation omitted). While absolute disparity measures the difference between the percentage of a group in the general population and its percentage in the qualified wheel, comparative disparity measures the decreased likelihood that members of a distinct and under-represented group will be called for a jury. United States v. Chanthadara, 230 F.3d 1237, 1257 (10th Cir. 2000); Shinault, 147 F.3d at 1272. In order to warrant judicial intervention, the disparities must be "gross" or "marked." Yazzie, 660 F.2d at 428; United States v. Test, 550 F.2d 577, 590 (10th Cir. 1976).

Absolute disparity is the starting point for all other methods of comparison in this circuit. Chanthadara, 230 F.3d at 1256; Shinault, 147 F.3d at 1273. The highest absolute disparity here, in either the 1993 or 1997 wheels, was 3.57%. This disparity falls far short of the percentages in cases in which the Supreme Court has found a Sixth Amendment violation. See Duren, 439 U.S. at 365-66 (39% absolute disparity); Casteneda, 430 U.S. at 482 (40% absolute disparity); Jones v. Georgia, 389 U.S. 24 (1967) (14.7% absolute disparity). Moreover,

selection mechanisms with absolute disparities higher than those presented in this case have been upheld. Yazzie, 660 F.2d at 427 (4.29% absolute disparity); Gault, 141 F.3d at 1402-03 (7% absolute disparity); Test, 550 F.2d at 588-89 (4% absolute disparity).[7] The numbers for the district's jury wheels for 1993 and 1997 fall clearly within this range. See Shinault, 147 F.3d at 1273.

Similarly, we have upheld selection procedures with higher comparative disparities than those involved here, which range from 38.17% to 51.22%. In Shinault, the comparative disparities were 59.84%, 50.09% and 48.63% with group populations comprising 1.27%, 5.11% and 2.92% of the total community, respectively. Id. The court noted that while "these numbers may be more indicative of a Sixth Amendment violation, they [] are distorted by the small population of the different minority groups . . . considering the small size of each of the groups in relation to the larger community, it is not surprising that the

_____

[7] Other circuits have upheld selection mechanisms with absolute disparities between 2% and 11.5%. See e.g., United States v. Hafen, 726 F.2d 21, 23 (1st Cir. 1984) (2.02%); Bryant v. Wainwright, 686 F.2d 1373, 1377-78 (11th Cir. 1982) (7.4%); United States v. Hawkins, 661 F.2d 436, 442 (5th Cir. 1981) (5.45%); United States v. Clifford, 640 F.2d 150, 155 (8th Cir. 1981) (7.2%); United States ex rel. Barksdale v. Blackburn, 639 F.2d 1115, 1126-27 (5th Cir. 1981) (11.5%); United States v. Potter, 552 F.2d 901, 906 (9th Cir. 1977) (2.7%) (rev'd on other grounds), United States v. Brady, 579 F.2d 1121, 1132 (9th Cir. 1978); Thompson v. Sheppard, 490 F.2d 830, 832-33 (5th Cir. 1974) (11.0%); United States v. Musto, 540 F.Supp. 346, 356 (D.N.J. 1982), aff'd sub nom., United States v. Aimone, 715 F.2d 822 (3d Cir. 1983) (5.4%).

comparative disparity numbers are large." Id. (internal citations and quotations omitted). The court concluded that these figures were not "gross" or "marked" enough to warrant judicial intervention. Id. In Chanthadara, comparative disparities of 40.89% (for the group 7.9% of the population) and 58.39% (for the group 2.74% of the population) were insufficient to establish a prima facie violation. 230 F.3d at 1257. Here, the comparative disparity figures are less: 35.41%, 36.82%, 54.41%, and 54.97%, while the percentage of adult populations are roughly the same. As such, the comparative disparity figures here are insufficient to establish a prima facie case that the representation is not fair and reasonable.

Mr. Orange suggests that persistent and statistically significant disparities in minority representation (based on other statistical measures) exist and that such a showing, coupled with reasonable procedures the district could have taken to reduce such disparities, should establish a prima facie case. Aplt. Br. at 42. We reject that approach when the existing measures, absolute and comparative disparity, fail to establish a prima facie case under existing law. A court's consideration of reasonable measures that may reduce disparity is primarily remedial and really does not address whether the disparity is a result of systematic exclusion of a particular group.

We do recognize, as we have in the past, certain limitations associated

- 13 -

with using absolute and comparative disparities as our measures in these types of cases. See Shinault, 147 F.3d at 1273 ("Indeed, small absolute disparity figures are less persuasive in a case . . . where, because of the minorities' small population, even the complete exclusion of the groups would result in absolute disparities of less than 6%. . . . [Similarly], the smaller the group is, the more the comparative disparity figures distorts the proportional representation."); Chanthadara, 230 F.3d at 1256-57 (internal citations and quotations omitted); see also United States v. Jackman, 46 F.3d 1240, 1247 (2nd Cir. 1995) (discussing weakness of absolute disparity analysis); Hafen, 726 F.2d at 24 (discussing weakness of comparative disparity analysis). Still, we have consistently used these methods, and absent evidence of intentional tampering, selection procedures that result in disparities within the accepted range will be upheld.

Mr. Orange did present evidence based on other statistical measures, such as chi square and standard deviation, and suggested that the selection process was non-random. Tr. Vol. 3 at 99-100, 102-09. Absent direct evidence of tampering or purposeful discrimination, we hold that when a court is presented with evidence of comparative and absolute disparities, and those disparities fall within our accepted range, a court need not look further into other statistical methods.[8]

_____

[8] Mr. Orange's case is entirely distinguishable from, and our holding not inconsistent with, the Sixth Circuit's decision in United States v. Ovalle, 136 F.3d 1092, 1104-1107 (6th Cir. 1998), where the court held that proof of disparities

Nor do we find any systematic exclusion in the district's jury selection methods. Systematic exclusion is exclusion "inherent in the particular jury-selection process utilized." Duren, 439 U.S. at 366. Mr. Orange identified several causes for the alleged minority under-representation: (1) the clerk's office made no effort to update addresses before mailing questionnaires, or any effort to locate those whose questionnaires were returned as undeliverable, thereby decreasing representation in the more mobile minority population, Aplt. Br. at 16-17; (2) the minority population was less likely to return the juror questionnaires and the clerk's office takes no further follow-up action, Aplt. Br. 19-22; and (3) the voter registration list is itself unrepresentative because minorities are less likely to register to vote as their majority counterparts, Aplt. Br. 23-25. Mr. Orange urges the use of the Department of Public Safety ("DPS") list of holders of drivers' licenses and identification cards. Aplt. Br. at 23.

None of these purported causes for under-representation constitute systematic exclusion. Discrepancies resulting from the private choices of potential jurors do not represent the kind of constitutional infirmity contemplated

was unnecessary. There, the jury selection plan at issue, in an effort to assure that African-Americans are fairly represented in the qualified jury wheel, one in five non-African-Americans were selected at random to be removed from the jury wheel simply because of their racial status. Id. at 1105. Thus Ovalle dealt with the situation, distinct from the one presented here, where the plan affirmatively excludes jurors based on race.

by Duren.  See Test, 550 F.2d at 586-87; see also Barber v. Ponte, 772 F.2d 982, 997 (1st Cir. 1985) (en banc); United States v. Cecil, 836 F.2d 1431, 1446-47 (4th Cir. 1988).  The circuits are "in complete agreement that neither the Act nor the Constitution require that a supplemental source of names be added to voter lists simply because an identifiable group votes in a proportion lower than the rest of the population."  Test, 550 F.2d at 587 n.8 (collecting cases) (internal quotations and ellipses omitted).  In addition, voter registration lists are the presumptive statutory source for potential jurors.  28 U.S.C § 1863(b).

Because Mr. Orange cannot satisfy the second element of Duren, he cannot establish a prima facie case that the Western District of Oklahoma's selection procedure violates the Sixth Amendment or the Jury Service Selection Act of 1968.[9]  Mr. Orange cannot establish a Fifth Amendment violation because the record does not support any purposeful discrimination, Duren, 439 U.S. at 368 n. 26, and Mr. Orange has failed to show systematic exclusion.

Finally, we turn to Mr. Orange's statutory claim that the district's grand jury procedure violates the Jury Selection and Service Act's proportionality requirement.  28 U.S.C. § 1863(b)(3) requires a plan to assure that "each county,

---

[9] We also find unpersuasive Mr. Orange's arguments that the selection plans violate statutory requirement of randomness, Aplt. Br. at 60, and the alleged "creation of a non-statutory exclusion."  The failure of a person to comply with the law and return a jury questionnaire does not violate either of these provisions.

parish, or similar political subdivision is <u>substantially</u> proportionally represented in the master jury wheel for that judicial district, division, or combination of divisions." <u>Id.</u> (emphasis added).

Specifically, the number of prospective jurors from each divisional wheel to the pool from which Mr. Oranges grand jury was drawn was:

| Oklahoma City | 62 |
|---------------|----|
| Enid-Ponca City | 13 |
| Lawton-Mangum | 15 |
| Woodward | 10 |

The district court determined that the correct proportional allocation (and Mr. Orange does not challenge, Aplt. Br. at 63) should have been:

| Oklahoma City | 66 |
|---------------|----|
| Enid-Ponca City | 12 |
| Lawton-Mangum | 15 |
| Woodward | 7 |

The district court found that while there existed a "minor geographic imbalance," there was insufficient evidence for a substantial violation of the Act. <u>Orange</u>, 364 F.Supp. 2d at 1297. We agree. "Mere geographical imbalance [as measured by a division's over representation in a master jury wheel], absent evidence that an identifiable and cognizable segment of the community has been systematically excluded or underrepresented by reason of such imbalance, does

not violate the statutory and constitutional requirement that the jury panel represent a fair cross section of the community." Test, 550 F.2d at 582 n.4 (internal quotations omitted).

The differences here (one in twenty-five misplaced jurors) are not significant enough to constitute substantial failure to comply with the Act. See United States v. Bailey, 76 F.3d 320, 322 (10th Cir. 1996). It does not necessarily follow that because the minimally under-represented district has the highest black population, a correction would have resulted in a higher number of black jurors. Moreover, having already determined that the district-wide composition did not have disparity substantial enough to warrant judicial intervention, Mr. Orange has failed to show that the geographic imbalance carried with it a racial impact.

In Mr. Orange's case, the merits of his jury composition claim would have failed under both constitutional and statutory standards. As such, there could be no prejudice from his counsel's failure to raise the issue. Mr. Orange thus failed to satisfy the prejudice prong of Strickland, and the district court properly denied his § 2255 motion based on ineffective assistance of counsel.

AFFIRMED.

*United States v. Orange*, No. 05-6105
**McCONNELL**, J., concurring.

I am not necessarily convinced that, "[a]bsent direct evidence of tampering or purposeful discrimination, . . . when a court is presented with evidence of comparative and absolute disparities, and those disparities fall within our accepted range, a court need not look further into other statistical methods," as the majority holds, Maj. Op. 13-14, especially where expert testimony indicates that there exist low cost, but effective, means by which disparities could be significantly reduced, even without resorting to sources other than voter registration lists. But I am convinced that the great weight of this Circuit's precedent points in that direction, and that defense counsel cannot be thought to have provided constitutionally ineffective assistance on account of devoting his energies to other more promising lines of defense. I therefore concur in the judgment.