FILED
**United States Court of Appeals**
**Tenth Circuit**

**October 25, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

KILLIU FORD,

    Defendant - Appellant.

No. 17-1122
(D.C. Nos. 1:15-CV-02213-REB and
1:11-CR-00303-REB-2)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HARTZ**, **HOLMES**, and **BACHARACH**, Circuit Judges.
_____

Defendant Killiu Ford was convicted in the United States District Court for the

District of Colorado on two counts of kidnapping, *see* 18 U.S.C. § 1201(a)(1); two counts

of kidnapping minor children, *see id.* §§ 1201(a)(1) & 3559(f)(2); one count of

conspiracy to kidnap, *see id.* § 1201(c); and one count of possession of a firearm during a

crime of violence, *see id.* § 924(c). The district court sentenced him to 600 months'

imprisonment. We affirmed his conviction and sentence on appeal, *see United States v.*

---

[*] After examining the briefs and appellate record, this panel has determined unanimously
that oral argument would not materially assist in the determination of this appeal. *See*
Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted
without oral argument. This order and judgment is not binding precedent, except under
the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R.
32.1.

*Morgan*, 748 F.3d 1024, 1028 (10th Cir. 2014); and the Supreme Court denied his petition for a writ of certiorari, *see Ford v. United States*, 135 S. Ct. 298 (2014).

In November 2015 Defendant filed a motion under 28 U.S.C. § 2255 challenging his conviction and sentence on 11 grounds. The following June he filed a motion to amend and supplement his § 2255 motion with a challenge to his § 924(c) conviction based on the Supreme Court's recent decision in *Johnson v. United States*, 135 S. Ct. 2551, 2557 (2015). The district court denied all 11 claims in the original § 2255 motion, including the claim that his trial attorney was ineffective for failing to investigate and call his wife Shavonda L. Sterling and cousin Keino K. Taylor as alibi witnesses. And it denied as untimely Defendant's *Johnson* challenge to his § 924(c) conviction.

Defendant requested a certificate of appealability (COA) from this court to permit him to appeal two alleged errors by the district court: (1) denial of his alibi-witness ineffective-assistance-of-counsel claim and (2) denial of his § 924(c) claim. *See* 28 U.S.C. § 2253(c)(1)(B) (requiring a COA to appeal denial of a § 2255 motion). We have granted that request. The government waived its timeliness objection to the § 924(c) claim and confessed error, so we reverse Defendant's conviction on the § 924(c) charge and remand with instructions to vacate that conviction and resentence Defendant. There remains for consideration only Defendant's ineffectiveness claim.

Defendant argues that there was no reasonable basis for trial counsel's failure to call Sterling or Taylor to testify after they had both informed counsel that Defendant was home at the time of the kidnappings. And he argues that the failure to call both witnesses was clearly prejudicial to his defense, because "the government's case here hung on

2

testimony of unindicted coconspirators, who were of course subject to impeachment based on the benefits that they received from their cooperation; and on the purported voice recognition by one of the alleged victims, who likewise received the benefit of a more favorable plea agreement in exchange for his testimony." Aplt. Br. at 30.

"We review the district court's legal rulings on a § 2255 motion de novo and its findings of fact for clear error. A claim for ineffective assistance of counsel presents a mixed question of fact and law, which we review de novo." *United States v. Orange*, 447 F.3d 792, 796 (10th Cir. 2006) (citation omitted). To establish ineffective assistance of counsel, Defendant must show both that counsel's performance was deficient and that this deficiency prejudiced him. *See Smith v. Duckworth*, 824 F.3d 1233, 1249 (10th Cir. 2016). To demonstrate prejudice, Defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). We can consider *Strickland*'s performance and prejudice prongs in any order, *see id.* at 697; an insufficient showing on either one is fatal to an ineffective-assistance claim, *see id.* at 700.

We affirm the denial of Defendant's claim because the evidence against him was very strong and the alibi evidence was weak. We begin with the incriminating evidence.

Defendant and two codefendants, Tracy Morgan and Augustus Sanford, were convicted by a jury at a joint trial. Evidence at trial indicated that the three men, together with Marvin Tabor and his step-brother Xallier Patterson (who both testified for the

government at trial), plotted in August 2009 to kidnap and rob Mario Armendariz, *see Morgan*, 748 F.3d at 1028–29, a drug supplier for Tabor's drug-dealing operation. Our opinion affirming the convictions summarized the core evidence as follows:

> Pursuant to their plan, Mr. Morgan attached a GPS tracking device to Mr. Armendariz's car while Mr. Armendariz was visiting Mr. Tabor's home. Mr. Tabor then tracked Mr. Armendariz's location on the Internet using Google Maps, enabling Mr. Morgan and Mr. Ford to follow Mr. Armendariz in their vehicle.

> Also in late summer 2009, Mr. Tabor's brother-in-law, Mr. Sanford, persuaded a police officer's minor child to steal four weapons and parts of a police uniform—including cargo pants, a black police shirt, and an orange reflective vest—from his father in exchange for two ounces of marijuana. Mr. Sanford also painted his Chevrolet Tahoe black.

> Around 11:00 p.m. on September 22, 2009, the Defendants and Mr. Tabor met at Mr. Tabor's house. Mr. Sanford wore the stolen police gear. The Defendants then departed to locate Mr. Armendariz. Mr. Tabor remained at his home and tracked Mr. Armendariz using the GPS device and Google Maps, speaking with the Defendants on a cell phone to update them with Mr. Armendariz's location.

> That night, Mr. Armendariz and his wife, Perla Flores, were getting into their car with their two young daughters outside of a cousin's house when they saw two armed men exit a black Chevrolet Tahoe and at least one other man arrive from across the street. The men announced they were police officers and ordered Ms. Flores and Mr. Armendariz to lie on the ground. One of the men was wearing a reflective police vest. Evidence at trial established the Defendants were present.

> Two of the men zip-tied Mr. Armendariz's arms and legs together, covered his head, and put him into the back of the Tahoe. Mr. Ford got into the Tahoe and questioned Mr. Armendariz about where he kept his money while an unknown coconspirator drove the Tahoe around. Eventually the Tahoe dropped off Mr. Ford at Mr. Armendariz's home. The Tahoe drove away and parked in a different location.

> Meanwhile, Mr. Sanford drove Ms. Flores and her daughters in her car to the Flores–Armendariz home. Mr. Ford and Mr. Morgan met him there.

4

The Defendants confronted Ms. Flores, demanding to know where Mr. Armendariz kept his money. Ms. Flores refused to tell them.

Mr. Morgan put a gun to the three-year-old daughter's head, and Ms. Flores then told them the money was under her daughter's dresser. Mr. Morgan retrieved $30,000 from under the dresser and left the home. Mr. Sanford and Mr. Ford continued to search the house, but after realizing Mr. Morgan had already left with the money, they also exited the home.

Ms. Flores left the house looking for help. She saw a black sport utility vehicle pick up Mr. Sanford and Mr. Ford. The driver then drove away from the home, stopped several miles away, and dropped off Mr. Armendariz on the side of the road.

Later that night or early the next morning, Mr. Ford and Mr. Sanford looked for Mr. Morgan and found him at a Taco Bell. They divided the money Mr. Morgan took from Mr. Armendariz's home.

Mr. Sanford returned to Mr. Tabor's home and complained to Mr. Tabor and Mr. Patterson about Mr. Morgan's keeping too much of the proceeds. Mr. Ford called Mr. Tabor's home to discuss the kidnapping and robbery with Mr. Tabor and Mr. Patterson. He also complained that Mr. Morgan kept more than his share of the money. Mr. Morgan joined the phone call for a brief moment and told the others he would arrive at Mr. Tabor's house within several hours. The group met at Mr. Tabor's house and redistributed the proceeds from the kidnapping and robbery.

*Id.* at 1029–30 (footnotes omitted).

This account was derived from testimony by several witnesses and recordings of telephone conversations intercepted by a wiretap authorized for a separate drug investigation. Tabor testified to Defendant's role in both the preparation for the kidnapping and robbery and the crimes themselves. Defendant brought the money for the drug deal used to get Armendariz to Tabor's home in August 2009. Then Defendant helped Morgan attach the GPS tracker to Armendariz's car while Armendariz was at the home. Also, Defendant assisted Morgan in conducting surveillance of Armendariz on

one occasion after the tracker was attached.  For the execution of the plan, Defendant came to Tabor's home at about 11:00 p.m. on September 22.  He, Morgan, and Sanford arrived in separate vehicles.  After the men used the tracker to locate Armendariz, Defendant departed with Morgan and Sanford.  Defendant returned to Tabor's home the next morning and gave him $1500.  Morgan and Sanford returned later that evening, when Sanford gave Tabor another $900.  At trial, Tabor was impeached based on his prior felony convictions and the reduction in sentence he would receive for cooperating with the prosecution, although there was no suggestion that he had a particular animus against Defendant that would have led him to falsely add Defendant's name as a coconspirator.

Armendariz also testified about his kidnapping.  He identified Defendant as one of the kidnappers.  Although he did not testify that he had seen Defendant's face during the incident (as the assailants were masked and he was blindfolded while in the Tahoe), he said that he recognized Defendant's voice from having been involved in drug transactions with him on three prior occasions.  In particular, Armendariz testified that Defendant spoke to him while the Tahoe was en route to his home, stating that he was a law-enforcement officer making a drug bust and asking for his cooperation.  He said that he did not hear Defendant's voice for the roughly 15–20 minutes that the Tahoe was stopped and unoccupied, but that once the kidnappers reentered the car and started driving, Defendant questioned him repeatedly about how much money he had in his home.  He told Defendant $30,000.  Armendariz was impeached based on prior felony convictions and the agreement of the prosecution to recommend a reduced sentence on pending drug

6

charges against him, but again there was no suggestion that he had a particular animus against Defendant.

Flores's testimony corroborated much of her husband's account of his kidnapping, although she did not identify Defendant or the other kidnappers. She also testified about her own experience after being separated from her husband—including how three men confronted her and her daughters at gunpoint inside her home, compelled her to tell them where the money was, and took the cash, as well as jewelry and electronics. The one who seemed to be in charge took the cash and left. When the others realized he was gone, they also left the home; and she saw them being picked up by the SUV that her husband was in. Flores did not receive any benefit from the prosecution for her testimony.

Katina Bell, Morgan's girlfriend at the time of the crimes, was another government witness. She said that she picked up Morgan at the home of Defendant's sister sometime after her work shift ended at 1:00 or 2:00 a.m. on the night of the kidnapping, and the two of them went to a Taco Bell to eat. Shortly thereafter, Defendant and Sanford pulled up in a black Tahoe. They were upset and demanded that Morgan get in the Tahoe, which he did. Bell then got food at the Taco Bell and drove home. When Morgan came to her home some 30 to 45 minutes later, he pulled out a stack of money from his jacket and put it in his bag.

Portions of the above testimony were corroborated by eight recordings of wiretapped conversations. Patterson briefly testified about three recordings (and nothing else). On a call on September 11 and on two calls on September 18, Patterson and

7

Morgan discussed Armendariz's location and movement. Patterson never mentioned Defendant at trial. Tabor testified about the five remaining recorded conversations. In four of these conversations Tabor and Morgan planned the kidnapping: they discussed the online purchase and delivery of the GPS tracker, and getting Defendant to bring funds for the August drug deal with Armendariz.

The final recording, and the most compelling evidence against Defendant, was a conversation recorded on September 23, 2009. It began at 3:19 a.m., not long after the kidnapping, and lasted 42 minutes. Defendant called Patterson on his cell phone and spoke with both Patterson and Tabor. During the conversation Defendant reports what had happened during the kidnapping, an account that closely matched Flores's testimony: He and Sanford tied Armendariz's hands and put him in the back of the Tahoe. The two men and Morgan then searched the Flores-Armendariz home and found three cash bundles of $10,000 each, as Armendariz had told them. They also took jewelry. Then Morgan departed unexpectedly with the money, leaving Sanford and Defendant behind. They were able to track down Morgan at a Taco Bell, and the three men then went to the home of Defendant's sister to split the proceeds, although Defendant suspected that Morgan kept more than his fair share.

This is compelling evidence. And Defendant's alleged alibi evidence does little to undercut it. Defendant claims that the testimony of Taylor and Sterling (his wife) would have "provided specific facts that placed [him] at home on the night and during the time frame in which the crimes were committed," Aplt. Br. at 10, and would have "tilted the scales in favor of [Defendant's] acquittal," Aplt. Reply Br. at 2. But the affidavits of the

8

two alibi witnesses describe events on the evening of September 23 and morning of September 24, one day *after* the crimes. Even if we "correct" the dates, the affidavits are insufficient to create substantial doubt. Taylor's affidavit states that he saw Defendant at Defendant's home between 8:00 p.m. and 8:30 p.m. Defendant had been sleeping on the couch and was not dressed to go out. But this tells us virtually nothing regarding Defendant's whereabouts at the time of the kidnappings about two hours later.

As for Sterling's affidavit, she states that she and Defendant were in bed together after 10 p.m. when he got a call that upset him. Afterwards he fell asleep before she did. About 3:00 a.m. she was awakened by a call to his cell phone. She answered but the caller hung up. She then awoke Defendant so he could answer if the caller called back. He answered the next call, but again the caller hung up. He then called the number and had a hushed conversation for a few minutes before leaving for about a half hour. The statement about Defendant's bedtime is of some help to Defendant, but the account of the 3:00 a.m. call is strong confirmation that it was Defendant's voice on the most incriminating evidence against him—the recording of the 3:19 a.m. call. On the whole, Sterling's affidavit probably would somewhat strengthen the case against Defendant.

In our view, Defendant fails to "show that there is a reasonable probability that . . . the result of the proceeding would have been different," *Strickland*, 466 U.S. at 694, if counsel had called Taylor and Sterling as witnesses.

We **AFFIRM** the ruling of the district court denying Defendant's claim of ineffective assistance of counsel based on failure to investigate and call alibi witnesses.

9

We **REVERSE** Defendant's conviction under 18 U.S.C. § 924(c) and **REMAND** to the district court for further proceedings consistent with this order.

Entered for the Court

Harris L Hartz
Circuit Judge