FILED
United States Court of Appeals
Tenth Circuit

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

**August 18, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

_____

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

CARLOS FERNANDEZ-BARRON,

Defendant - Appellant.

No. 21-1396
(D.C. Nos. 1:21-CV-00773-RM &
1:15-CR-00360-RM-5)
(D. Colo.)

_____

## ORDER DENYING CERTIFICATE OF APPEALABILITY[*]
_____

Before **HARTZ**, **HOLMES**, and **McHUGH**, Circuit Judges.
_____

Carlos Fernandez-Barron ("Mr. Barron")[1] seeks a certificate of appealability

("COA") to challenge the district court's denial of his motion to vacate, set aside, or

correct his sentence pursuant to 28 U.S.C. § 2255.  We deny a COA and dismiss this

matter.

_____

[*] This order is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1] We will refer to the appellant as "Mr. Barron" because at trial, he agreed to being addressed as Mr. Barron.

## I. Background

Mr. Barron was convicted in federal district court on two counts of conspiracy, distribution, and possession with intent to distribute cocaine.[2] He was acquitted of two other counts of possession and distribution. Based on a finding that Mr. Barron committed perjury when testifying at trial, the district court imposed a two-level sentencing adjustment for obstruction of justice. On direct appeal, Mr. Barron challenged the adjustment, but we affirmed. *See United States v. Fernandez-Barron*, 950 F.3d 655, 657 (10th Cir. 2019). Mr. Barron then filed his § 2255 motion. The district court denied that motion and a COA.

## II. COA Standard and Scope of COA Request

Before he may appeal, Mr. Barron must obtain a COA. *See* 28 U.S.C. § 2253(c)(1)(B). To do so, he must make "a substantial showing of the denial of a constitutional right," § 2253(c)(2), such that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

In his § 2255 motion, Mr. Barron raised four claims of ineffective assistance of counsel and a claim of cumulative error. The district court denied all five claims. We view Mr. Barron's COA application and supporting brief he filed in this court ("COA

---

[2] The convictions involved (1) Count One, conspiracy to distribute and possess with intent to distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine and (2) Count Four, distribution and possession with intent to distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine, all in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(ii)(II), and 846.

2

Application") as seeking a COA only as to the district court's denial of relief on claim two of his § 2255 motion—that trial counsel was ineffective in failing to investigate facts related to the perjury on which the court based the sentencing adjustment. We take this view because in the "Appellant's Brief" section of his COA Application, Mr. Barron adequately addresses only the merits of claim two. Although he also claims error in the district court's denial of other ineffectiveness claims, he does so only in summary fashion. *See* COA Appl. at 22–24. And the "Statement of the Issues" and "Argument and Authorities" sections of his COA Application are confined to issues related to claim two. *See id.* at 11–12, 24–38. Furthermore, as we later explain in greater detail, the issues raised in the "Arguments and Authorities for COA" section of his COA Application, *id.* at 5–10, rest on a misreading of the district court's ruling on a different ineffectiveness claim and in any event concern matters rendered moot by our denial of a COA on claim two.

### III. Trial Proceedings

At trial, the government's theory of the case was that Mr. Barron participated in a drug ring that repeatedly transferred large quantities of cocaine from El Paso, Texas, to Denver, Colorado, in secret compartments of vehicles driven by load drivers. On arrival in Denver, members of the conspiracy would pick up the load vehicles and deliver them to a stash house, where the cocaine was unloaded and distributed. Conspiracy members then loaded cash proceeds from the drug sales back into the secret compartments, and the load drivers drove the cash back to El Paso. From there, the cash was sent to Mexico. The government asserted that Mr. Barron was part of a group that worked at the stash

house.  We need not recount all of the evidence that supported this theory.  For our purposes, the following suffices.

One of the load drivers, Martha Mota, testified that on one occasion, she delivered a load to Kansas City, where two people picked up her vehicle.  At trial, she identified a photo of Mr. Barron as one of those two people, but she was unable to identify him in the courtroom.  Ms. Mota also testified that the two people had driven a gray, four-door car she thought looked like a Chevrolet Impala.

On another occasion, in March 2014, a surveillance video of the stash house showed Mr. Barron arrive there in an Impala, retrieve a bag from inside the house, and leave in the Impala.  The government presented evidence that he owned the Impala and frequently drove it until that day; thereafter, he stopped driving it because the surveillance had been detected.

On May 14, 2014, a load driver arrived in Colorado.  A member of the conspiracy, Kenneth Molina-Villalobos, sent a text message to Mr. Barron that said:  "Where do we pick up the BMW, Buddy?"  ECF No. 725 at 183 (internal quotation marks omitted).[3]  At trial, the government presented a drug trafficking expert who testified that individuals will often use vehicle names as code for drugs, particularly when they are in the vehicle business, as was Mr. Barron.  The expert further testified that the reference to the BMW

---

[3] Mr. Barron's appendix lacks a number of district court filings we consider relevant to our analysis.  We take judicial notice of them because "they are accessible from the district court docket," *Bunn v. Perdue*, 966 F.3d 1094, 1096 n.4 (10th Cir. 2020), and we cite to them by their Electronic Case Filing ("ECF") docket number in Case No. 15-cr-360-RM-5 (D. Colo.).

did not involve an actual vehicle transaction but was instead code for the load vehicle. The expert acknowledged that his opinion would be different if the reference to a BMW involved an actual BMW.

Mr. Barron testified in his own defense, denying any knowledge of drugs or drug activity. Relevant here, he testified that he owned a BMW until May 30, 2014, when co-conspirator Lucio Ivan Lozano "took possession of [it]," *id.* at 170, and that the reference to a BMW in the May 14 text message was not code for drugs but referred to the sale of the BMW, *see id.* at 168–70. He also testified that even though the Impala was registered in his name, it belonged to another co-conspirator, Jose Licon-Gallegos, who had paid for it. *See id.* at 170–71; ECF No. 727 at 19–20.

As noted, the jury convicted Mr. Barron on two counts. At sentencing, the court found his testimony about the BMW and the Impala was both material and willfully false because evidence showed he sold the BMW to a dealership in September 2014 and had in fact owned the Impala.[4] Based on the perjury, the court imposed a two-level adjustment for obstruction of justice pursuant to United States Sentencing Guidelines § 3C1.1.[5] The

---

[4] "To establish perjury, a district court must conclude the defendant (1) gave false testimony under oath, (2) about a material matter, and (3) the false testimony was willful and not the result of confusion, mistake or faulty memory." *United States v. Rodebaugh*, 798 F.3d 1281, 1300 (10th Cir. 2015) (internal quotation marks omitted).

[5] Section 3C1.1 provides:

If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's

5

court then sentenced Mr. Barron to two concurrent sentences of 135 months of imprisonment, which reflected a 120-month statutory minimum sentence, *see* 21 U.S.C. § 841(b)(1)(A), plus 15 months for the obstruction.

## IV.  Section 2255 Discussion

In claim two of his § 2255 motion, Mr. Barron argued that had trial counsel investigated the perjury claim, counsel would have been able to present evidence to refute the allegations that Mr. Barron's testimony about the BMW and the Impala was untruthful.  He provided some new evidence and proposed that had it been presented to the district court at sentencing, the court would not have imposed the two-level adjustment or sentenced him to the maximum under the Guidelines, and would have considered applying the so-called "safety valve" to impose less than the statutory minimum sentence.  In relevant part, the "safety valve" allows a court to sentence a defendant "without regard to any statutory minimum sentence" if the court finds that the defendant "truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan."  18 U.S.C. § 3553(f)(5).

The district court denied relief, applying the familiar standard for claims of ineffective assistance of counsel set out in *Strickland v. Washington*, 466 U.S. 668 (1984).  Under *Strickland*, to establish constitutionally ineffective assistance of counsel, a

---

offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

defendant must show that "counsel's representation fell below an objective standard of reasonableness," *id.* at 688, and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694.

In denying relief, the district court first explained that its determination that the safety valve did not apply was based on more than just Mr. Barron's testimony about the BMW and the Impala and thus, even setting aside that testimony, the mandatory minimum 120-month sentence would apply. Mr. Barron has not challenged that determination, so he fails to show that reasonable jurists would debate it.

Next, the district court observed that Mr. Barron provided nothing to show trial counsel did not investigate the history of the two vehicles, such as an affidavit from trial counsel or Mr. Barron. Consequently, the court concluded Mr. Barron had not established that trial counsel performed an inadequate investigation. Mr. Barron challenges this conclusion by arguing that even if trial counsel investigated and decided not to pursue a challenge to the perjury finding as a matter of trial strategy, that strategy was unreasonable because the obstruction of justice adjustment depended on Mr. Barron's credibility.

We consider this argument unpersuasive because reasonable jurists, examining the district court's factual findings regarding the new evidence for clear error, would not debate the court's determination that the new evidence would not have altered the perjury finding. *See United States v. Orange*, 447 F.3d 792, 796 (10th Cir. 2006) (applying clear-error standard to a district court's factual findings in a § 2255 proceeding); *cf.*

7

*United States v. Hankins*, 127 F.3d 932, 934 (10th Cir.1997) (assessing, on direct appeal, obstruction of justice adjustment under § 3C1.1 and noting that "we review the district court's factual determinations concerning the obstruction of justice enhancement for clear error only").  "A finding of fact is 'clearly erroneous' if it is without factual support in the record or if the appellate court, after reviewing all the evidence, is left with a definite and firm conviction that a mistake has been made." *United States v. Pulliam*, 748 F.3d 967, 970 (10th Cir. 2014).  We will "uphold any district court finding that is permissible in light of the evidence." *Id.*  With these principles in mind, we now turn to the district court's determination that the new evidence does not demonstrate a reasonable probability of a different outcome had it been presented at sentencing.

In addressing the new evidence, the district court first examined the declaration of Angelina Iniguez and exhibits attached to it.  Ms. Iniguez stated she had co-purchased the BMW with Mr. Barron on March 8, 2014, and "[a]bout [a] month" later, she "learned" that Mr. Barron sold the BMW to Mr. Lozano for cash.  Aplt. App., Vol. 3 at 28.  She stated she used the cash to pay off the loan on the BMW, and she attached a copy of her credit report showing the loan was paid in full.  She further stated that on September 18, 2014, she went to Emich Chevrolet "to sign the papers so that Lozano could use the BMW as a down payment on a corvette." *Id.*

The district court determined that title documents attached to Ms. Iniguez's declaration added nothing because the court already had them at sentencing, and the attached credit report failed to establish that the BMW was sold to Mr. Lozano or to identify the source of the funds used to pay off the loan.  The court also observed several

infirmities with Ms. Iniguez's statement that she "learned" Mr. Barron sold the BMW to Mr. Lozano about one month after she and Mr. Barron had purchased the car—i.e., in early April 2014. Specifically, the court noted that her statement (1) contradicted Mr. Barron's testimony that he sold the BMW to Mr. Lozano at the end of May 2014; (2) failed to explain why she, as an owner of the car carrying the financing, did not learn about the sale in "real time" and found out about it after it had happened; and (3) failed to explain how the sale was accomplished without her signing a sales or title transfer document. *Id.*, Vol. 2 at 95. The court further explained that the undisputed fact that Ms. Iniguez later signed documents in September 2014 regarding the sale of the BMW to Emich Chevrolet because she was listed on the title as a co-owner was the basis for the court's finding that Mr. Barron's testimony that he had sold the car to Mr. Lozano in May was untruthful. And, the court added, nothing in Ms. Iniguez's declaration explained "why Mr. Molina-Villalobos was consistently engaging in communication with [Mr.] Barron about a car supposedly being bought by [Mr. Lozano] or why these conversations coincided with . . . deliveries of large quantities of cocaine to the conspiracy." *Id.* at 96.

Mr. Barron takes issue with the district court's reliance on the inconsistency between Ms. Iniguez's statement that she learned Mr. Barron had sold the car to Mr. Lozano in early April and Mr. Barron's testimony that he sold the car to Mr. Lozano at the end of May 2014. He argues that given that Ms. Iniguez completed her declaration seven years after the fact, the district court erroneously interpreted her use of the phrase "[a]bout [a] month" to mean "an exact 30 days" instead of "approximately a month,"

9

which he posits means "a month or two." COA Appl. at 34. Mr. Barron adds that the district court should have considered the likelihood that Mr. Lozano needed more than 30 days to secure financing and that Mr. Barron could have verbally agreed to sell the BMW in April and delivered it in May.

The district court did not, however, interpret the time reference to mean an exact 30 days but said it referred to "early April 2014." R., Vol. 2 at 95. And reasonable jurists would not debate whether the district court clearly erred by not construing Ms. Iniguez's reference to "[a]bout [a] month," Aplt. App., Vol. 3 at 28, as meaning two months. Nor would they debate whether the court clearly erred by not speculating about a verbal sale agreement, financing, and delivery of the BMW to Mr. Lozano, none of which is supported by any evidence. In any event, Mr. Barron testified that he sold the car to Mr. Lozano *more than* two months after purchasing it in March 2014, and this temporal dispute was not the only reason the district court considered Ms. Iniguez's declaration unpersuasive. Mr. Barron has not contested the remainder of the court's analysis, and considered as a whole, reasonable jurists, applying a clearly erroneous standard of review, would not debate its correctness

Mr. Barron also supplied an affidavit from Emich Chevrolet's general manager stating that the BMW was in fact sold to the dealership on September 18, 2014, as a down payment on a Corvette that Mr. Lozano purchased that same day. The district court found that the affidavit did "not provide any significant information that was previously unavailable to the Court." *Id.*, Vol. 2 at 96 n.3. Mr. Barron fails to meaningfully confront this finding, arguing only that together, the manager and Ms. Iniguez

10

"corroborate that [Mr. Barron] sold equitable title of the BMW but that [she] and [Mr. Barron] still had legal title such that they had to be present during the September 2014 sale." COA Appl. at 31. Mr. Barron provides no authority for his "equitable title" argument, and it is unpersuasive in any event, particularly given his sister's testimony that he was in the business of repairing and re-selling cars, *see* ECF No. 726 at 111, 122–23. Moreover, even if the BMW was sold to the dealership and used as a down payment for another car in September 2014, reasonable jurists would not debate whether the district court clearly erred in finding willfully untruthful Mr. Barron's testimony that he did not own the BMW on May 14, 2014, when Mr. Molina-Villalobos sent the text message at issue. The documentary evidence clearly shows that Mr. Barron and Ms. Iniguez sold the BMW to the dealership in September 2014.

The last piece of new evidence Mr. Barron provided with his § 2255 motion was the affidavit of Howard Campbell, a professor of cultural anthropology claiming to have expertise in U.S.-Mexican border culture and drug trafficking. Dr. Campbell stated that when an undocumented person cannot legally purchase a car in the United States, "a number of legal workarounds are used, especially the 'prestanombre' system (essentially involving a 'straw' buyer) in which the name of the 'owner' or titleholder is different from that of the person who actually uses the car." Aplt. App., Vol. 3 at 5. Dr. Campbell added that this "is a very common practice," "is viewed by the undereducated and poor as a normal, not illegal practice" in Mexico, and when used in the United States, "[t]he undocumented person who actually provided the money for the purchase and who

11

actually uses the car considers themselves as the legitimate owner and titleholder of the vehicle." *Id.*

The district court concluded that Dr. Campbell's testimony would not have convinced the court that Mr. Barron had been truthful about the Impala because Mr. Barron was "not an undereducated, poor Mexican immigrant," as Dr. Campbell had described those viewing the "prestanombre" system as normal and legal, but "a Mexican citizen who held permanent resident status in the United States," had lived in this country continuously since age 11 (he was 38 at sentencing), had attended high school until dropping out in the eleventh grade to work, "had been a homeowner who was consistently employed," and "was engaged in the business of buying, repairing and selling cars." *Id.*, Vol. 2 at 97.

The court also deemed Dr. Campbell's testimony "off point" because the matter of the Impala "was not a situation where an immigrant could not legally purchase a vehicle resulting in a strawman's name being on the title." *Id.*  On cross-examination at trial, Mr. Barron testified that he was the legal owner of the car and had completed registration documents under penalty of perjury, but Mr. Licon-Gallegos "had the title," and Mr. Barron had only put license plates on it.  ECF No. 726 at 251.  On redirect examination the next day, Mr. Barron testified that he did not know what perjury was until the day before.  The district court noted that at sentencing, it had characterized this testimony as "'unmitigated nonsense'" and continued to hold that view.  Aplt. App., Vol. 2 at 97 (quoting ECF No. 729 at 33).  The court further found there had been "no testimony that [Mr.] Licon could not have obtained plates for the vehicle he legally

owned." *Id.* at 98.  Finally, the court determined that nothing in the "prestanombre"

system explained Mr. Barron's testimony that he did not understand what perjury was

until he was confronted on cross-examination.

Mr. Barron attempts to downplay his educational level, describing it as "a mere

eleventh grade education," and he plays up the complexity of "bare legal title versus

equitable title."  COA Appl. at 32.  He argues that Dr. Campbell's testimony shows that

his own testimony regarding both the Impala and the BMW was "not willfully false,"

*id.* at 32–33, as required for imposition of the § 3C1.1 adjustment.  This line of argument

fails to challenge the district court's reliance on Mr. Barron's familiarity with buying and

selling cars as a business, which this court previously recognized "could suggest

familiarity with state laws governing ownership," *Fernandez-Barron*, 950 F.3d at 662.[6]

Mr. Barron also points to this court's prior statements that "[w]ere we the

fact-finder, we might have credited [his] testimony that he'd been confused" about

ownership of the Impala, *id.* at 662, and that "Ms. Mota's identification of [him in Kansas

City] was weak," *id.* at 664.  However, we still are not the finder of fact, and we

discussed the weakness of Ms. Mota's identification in determining whether it was

relevant to the materiality of Mr. Barron's testimony denying ownership of the Impala,

not whether the testimony was willfully false.

---

[6] The district court considered and rejected the value of Dr. Campbell's testimony only in the court's discussion of the Impala.  But its reasoning applies even more strongly to the BMW.  The purported sale of the BMW to Mr. Lozano did not involve a strawman buying the BMW on Mr. Lozano's behalf, and given Mr. Lozano's later purchase of the Corvette, there was no showing that he was legally unable to purchase a car in the United States.

13

In sum, we are unpersuaded that reasonable jurists would debate the district court's conclusion that counsel's performance did not fall below an objectively reasonable standard or that, if it did, there is no reasonable probability that the new evidence Mr. Barron submitted with his § 2255 motion would have caused the court to find the § 3C1.1 adjustment inapplicable. We therefore deny a COA on claim two.

Finally, we address the issue Mr. Barron raises in the "Arguments and Authorities for COA" section of his COA Application. He alleges that "the district court emphasize[d] that it would have given [him] the same sentence, even if the obstruction of justice adjustment were absent." COA Appl. at 6. And he argues that if the obstruction adjustment did not apply, his Guidelines range would have been 87–108 months and the safety valve would have been in play, so imposing the same sentence (135 months) would have been an upward departure. He thus maintains that the district court erred in stating that sentencing errors of this type are not cognizable in a § 2255 proceeding because they do not involve a fundamental defect that results in a miscarriage of justice.

This argument is undeserving of a COA for two reasons. First, its premise is flawed because, contrary to his assertion, the district did not say it would have sentenced Mr. Barron to 135 months even if the adjustment did not apply. Instead, the court said that it had indicated at sentencing "that it would have given the *mandatory minimum* if obstruction had not occurred." Aplt. App., Vol. 2 at 100 (emphasis added).[7]

---

[7] This statement occurred in the district court's analysis of Mr. Barron's fourth § 2255 claim, which asserted ineffective assistance of trial and appellate counsel for failing to challenge sentencing issues concerning relevant conduct (the amount of drugs attributed to Mr. Barron) and sentencing disparity. The issue Mr. Barron raises in the

Second, we have denied a COA on claim two regarding the obstruction adjustment, and Mr. Barron ignores that the district court's refusal to apply the safety valve was based on more than just his testimony about owning the BMW and the Impala. Thus, Mr. Barron's speculation about what the court might have done if the adjustment did not apply is hypothetical. This court does not resolve hypotheticals. *See Preiser v. Newkirk*, 422 U.S. 395, 401 (1975) (explaining that federal courts have "neither the power to render advisory opinions nor to decide questions that cannot affect the rights of litigants in the case before them" (internal quotation marks omitted)).

## V. Conclusion

We deny a COA and dismiss this matter.

Entered for the Court

Jerome A. Holmes
Circuit Judge

---

"Arguments and Authorities for COA" section of his COA Application rests on a misreading of the remainder of the district court's discussion of *Strickland* prejudice on claim four. There, the court determined that even if Mr. Barron could prevail on his relevant-conduct argument, he would have received the same sentence based on the statutory 120-month minimum plus additional time that "[spoke] in an obvious way to [the] obstruction." *Id.* at 100. The court's additional statement Mr. Barron focuses on—that it was not clear "whether a cognizable claim is raised where much of the impact of an alleged guideline computation error is made irrelevant by the statutory mandatory minimum," *id.*,—had nothing to do with whether the obstruction adjustment applied.

To the extent Mr. Barron intended this line of attack to be a request for a COA on the district court's denial of relief on claim four, he has developed no argument that reasonable jurists could debate the court's rejection of that claim on the merits. He has therefore waived the opportunity to obtain a COA on the denial of relief on claim four. *See Becker v. Kroll*, 494 F.3d 904, 913 n.6 (10th Cir. 2007) ("An issue or argument insufficiently raised in the opening brief is deemed waived.").